**Luciano TORRES a/k/a Hinojos, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 08–01–00498–CR.**

Court of Appeals of Texas, El Paso.

April 8, 2004.

---

Joe A. Spencer, Jr., Joseph D. Vasquez, El Paso, for Appellant.

Jaime E. Esparza, District Attorney, El Paso, for State.

Before Panel No. 1 LARSEN, McCLURE, and DAVID WELLINGTON CHEW, JJ.

## *OPINION*

DAVID WELLINGTON CHEW, Justice.

Luciano Torres appeals his conviction for murder. Appellant was indicted with two counts of murder. The jury found Appellant guilty of Count I (killing the victim by striking her with a rock), and Count II (killing the victim by striking her with an unknown object) was dismissed. The same jury assessed punishment at 99 years' imprisonment and the trial court then sentenced Appellant in accordance with the jury's verdict and assessment. On appeal, Appellant raises seven issues for review in which he challenges jurisdiction, the trial court's refusal to allow renewal of Appellant's motion for instructed verdict, the effective assistance of his trial counsel, the legal and factual sufficiency of the evidence to support his conviction, and the trial court's refusal to submit a requested instruction to the jury on circumstantial evidence. We affirm.

## SUMMARY OF THE EVIDENCE

Appellant and Maria Jovita Valles, the deceased, were married in January 2000 and lived together in El Paso, Texas. After a couple of months, the couple and their respective children from previous marriages moved to a house in Chaparral, New Mexico. A month or two later, Ms. Valles and her children moved out of the house to an apartment in El Paso. Ms. Valles did not tell Appellant where she was living during their separation.

On Thursday June 15, 2000, Appellant went to the Eldorado Lounge in Northeast El Paso between 11 and 11:30 in the evening. At the bar, Appellant was drinking and asked to borrow another patron's cell phone. Appellant called Ms. Valles and asked her to join him. Shortly after, Ms. Valles arrived at the Eldorado by taxicab and joined Appellant in the bar. The couple drank and soon began arguing; however, they later stopped arguing and acted affectionate and amorous towards each other. A witness at the bar saw the couple leave together around 1 a.m., on June 16, 2000, holding hands and walking towards Appellant's truck. The witness later saw Appellant driving his truck on Dyer Street about five to seven minutes later, but could not see anyone else in the vehicle because it has tinted windows.

Maria Luisa Diaz, a close friend of Ms. Valles, was babysitting Ms. Valles' two children that night. Ms. Diaz went to Ms. Valles' apartment the next morning to return her children, but Ms. Valles was not there. Ms. Diaz thought this was unusual.

Ms. Diaz waited to hear from Ms. Valles for the whole day and by nighttime reported her missing to the police. A few days later, Ms. Diaz and her mother took Ms. Valles' children to Chaparral around 12 or 12:30 p.m. to try to locate Ms. Valles. When they arrived at Appellant's house, Appellant's son and some of Appellant's workers, including one nicknamed "Homie" were outside. Appellant's son came up to Ms. Diaz's car and Ms. Diaz asked him to call his father. The son went inside to get Appellant, but Appellant did not come out. Ms. Diaz did not see Appellant's pickup truck at the house. Homie did not speak to Ms. Diaz, but his gestures to Ms. Diaz suggested to her that Appellant was inside his office, which was near the house. Ms. Diaz kept Ms. Valles' children for almost two weeks before they were sent to live with their biological father in California.

Dolores Hinojos, Appellant's ex-wife, testified that she received a call from Appellant early in the morning on June 16, 2000 during which Appellant asked her to take care of his boys. When Ms. Hinojos asked if something was wrong, Appellant stated that things were not going well for him and sounded sad and depressed. Ann Marie Richardson, Appellant's probation officer, testified that she spoke with Appellant over the telephone on June 19, 2000 and asked him if he had seen or heard from Ms. Valles, who by that time had been reported missing. Appellant asked why she was inquiring and Ms. Richardson told him that she had received a message that Ms. Valles had dropped her children off and had not picked them up. Appellant told her that he had not seen or heard from Ms. Valles for a week and a half. Appellant spoke of Ms. Valles in the past tense, which made Ms. Richardson think that he was referring to someone "no longer with us" and Ms. Valles was gone. After speaking with Appellant, Ms. Richardson notified the police of their conversation.

On June 16, 2000, the El Paso Police Department received a call from the Chihuahua State Judicial Police in Juarez, Mexico reporting that a silver Dodge extended cab pickup truck had been found at a bus terminal. The truck had a New Mexico license plate on the rear bumper and a set of Texas plates in the bed of the truck, which actually belonged to that vehicle. The El Paso police went over to Juarez on June 20, 2000 to view the truck, which they later determined was Appellant's truck. Inside the truck, the officers found paperwork with Appellant's name, related to his roofing business. Stains in the interior of the truck tested negative for the presence of blood. The Juarez police turned over the following items to El Paso Police Department Officers Arturo Ruiz, Jr. and Tom Monday: a pair of blue jeans size 33 × 32, socks, and a rock measuring ten inches wide and two to three inches in height that was sharp or broken on one end. Testing revealed that the items recovered were heavily stained with blood and contained dirt and hair. The officers also observed that one of the windows in the extended cab portion of the truck was broken. The keys to Appellant's truck were later found in the vehicle of Ricky Baron, nicknamed Homie, a close friend and employee of Appellant.

On June 28, 2000, a woman's body was pulled from a canal/river behind the La Hacienda Restaurant on West Paisano in El Paso. The body was later identified as Maria Jovita Valles, the victim. She was clothed in the same outfit and jewelry she was wearing the night she disappeared. Dr. Juan Contin, the medical examiner for El Paso County, examined the body and performed the autopsy. Dr. Contin testified that the body was quite decomposed, with flesh missing on the head and on the

tips of the hands and feet. The only significant injury was a fracture in the skull, which started on the left side and traveled through the base of the skull to the other side. The major impact, however, was on the left side of the skull. Dr. Contin concluded that such an injury would result in a lot of bleeding. Dr. Contin agreed that the rock in evidence was capable of causing death or serious bodily injury. Based on the presence of the fracture in the skull, Dr. Contin opined that the victim died of a head injury and that the manner of death was homicidal. Chad Hainley, a criminalist with the Texas Department of Public Safety Crime Laboratory, testified that DNA analysis established that blood on the jeans, socks, and the rock recovered from Appellant's truck was consistent with the DNA profile from the victim's teeth.

At trial, Appellant testified in his defense. Appellant was self-employed as a roofing contractor and lived in Chaparral, New Mexico. His shop and office are located on the property. Appellant admitted that he has three DWI convictions, the last being a felony for which he was given five years' probation. Appellant also admitted that he was also on probation for an assault on his ex-wife. Appellant met his second wife, Ms. Valles, at a nightclub and they dated for some months before getting married. He described their relationship as fairly good. Ms. Valles worked at the George Washington nightclub and Appellant did not want her working there. This caused most of the friction in their relationship. Appellant thought they had been separated for about a month at the time of Ms. Valles' death.

Appellant stated that on the night of Ms. Valles' death, he contacted her over the phone while he was at the Eldorado Lounge. As a result of their conversation, Ms. Valles took a cab and met him at the bar. According to Appellant, he was at the bar by himself and drove to the bar in his truck. While he was inside the bar, Homie had his truck and was supposed to pick him up or meet him there. After Ms. Valles arrived they stayed in the bar for some hours. Appellant asked Brenda, a waitress, to get them a couple more drinks. When he mentioned the name "Brenda," Ms. Valles' became upset and they argued. They left the bar at closing time and went outside. Appellant was wondering what had happened to Homie and how he was going to get home or if Homie was going to pick him up. Appellant decided to walk to the 7–Eleven, about a block from the bar, to call Homie. Appellant did not know whether Homie was going to be home, but needed Homie to pick them up. As they were walking towards the store, Appellant saw Homie in Appellant's truck, making a turn at Hondo Pass and Dyer Street. Appellant kind of jumped in front of the truck to get Homie's attention. Homie stopped and Appellant asked to drive the vehicle. Homie got out, Ms. Valles got in the truck, then Homie jumped in the back and they drove off together.

Appellant decided to drive to his house. Ms. Valles asked to borrow some money to pay the rent and Appellant told her he did not have the money with him. Appellant told her that he would give her the money tomorrow or another day. Ms. Valles then told Appellant that if she did not get the money today, she would not get it another day. Appellant stated that Ms. Valles wanted to keep on drinking and go to Juarez. Appellant did not want to go because he had a lot of things to do the next day. They argued about the young lady named Brenda at the nightclub and Appellant told Ms. Valles that that was only the second time that he had talked to or seen Brenda. The argument ended for a little while and they kept driving and getting closer to Appellant's house. Appellant and

Ms. Valles then argued about going to Juarez to drink and Ms. Valles became pretty upset. According to Appellant, Ms. Valles reached over and struck him on the side of his head. Appellant turned and all of a sudden she was out the door. Appellant was driving about 40 to 45 miles per hour and did not have a chance to keep her in the vehicle. Appellant did not slam on his brakes, but rather slowed down until the truck came to a stop. He and Homie got out of the truck. Appellant left the truck ignition running with the parking brake on. They ran towards where Ms. Valles had fallen, but did not know where exactly and they were looking for her. Homie was running ahead of Appellant, who admitted at trial that he was pretty drunk. When Appellant got there, Homie was already holding Ms. Valles and Appellant observed that Ms. Valles was bleeding some from her head. Homie said that Ms. Valles was breathing, but was knocked out. Appellant was concerned about broken bones. He did not know whether she was okay or not, but there was quite a bit of blood on the ground. Appellant was also concerned about whether she had broken her neck.

Appellant thought that they needed to get Ms. Valles in the truck. He ran back to the truck and found that it was locked. Appellant ran back and told Homie that the truck was locked. Homie told Appellant to break into the truck. Appellant grabbed a rock, which was covered in blood, and went back to the truck. Appellant jumped in the bed of the truck and threw the rock through the back sliding glass door. Appellant crawled into the truck, opened it, got in, and drove back to where Ms. Valles was on the ground. Appellant held Ms. Valles' back and legs while Homie held her head, as they put her in the back of the truck on a tarp and dragged her towards the front. They used a ladder and other material to make a bed for her so she would be straight and not roll around.

Appellant thought that they should take Ms. Valles to the hospital and told Homie that they needed to take her there. Homie told Appellant that they were going to arrest him because he was drunk and in violation of his probation. Appellant decided to let Homie take Ms. Valles to the hospital. Appellant told Homie to take her to Thomason Hospital and that her purse was in the truck if he needed to provide any identification. Appellant walked home and went into his office. Appellant was waiting for Homie to call once he got Ms. Valles to the hospital. Appellant fell asleep while waiting and was awoken by the neighbor's roosters around 5:30 a.m. He never received a call and was wondering what had happened. Appellant called Homie at his house. Appellant asked Homie how Ms. Valles was doing and if she had been okay. Appellant learned that she was not okay.

A couple of days or so later, Appellant saw Homie and wanted to find out what had happened and to know where his truck was located. They went to Juarez to the place where Homie had left the truck and found that it was gone. They went back to Appellant's house in Chaparral. At the house, they sat and talked about what had happened. Appellant was confused about what to do and scared. Appellant decided to go to Mexico and he and Homie left a couple of days later for Torreon, Mexico. Appellant did not hang out with Homie very long in Mexico because what Homie had done to his wife was bothering Appellant. All Homie wanted to do in Mexico was drink and Appellant was not comfortable with that or with what had happened. At the time, Appellant disliked Homie very much because of the way he had gotten rid of Ms. Valles—by dumping her in the river. Appellant loved his wife and still loves

her and does not feel very happy about all that has happened. In Mexico, Appellant worked on a farm, fixing gates and fences for the corral. He was there for about a month and a half, but decided not to stay in Mexico because he did not feel comfortable about what had happened. Appellant returned, contacted an attorney, and later turned himself in. While in Mexico, Appellant lost weight, but at the time of the incident, he would not have fit into the jeans recovered from his truck. Appellant stated that those jeans belonged to Homie.

On cross-examination, Appellant discussed in further detail what occurred on the night Ms. Valles died. While at the Eldorado Lounge, Appellant called Ms. Valles twice. In the first call, she asked him to call her back and he did. Before she came over, Appellant had sent her flowers and when she arrived he paid for her cab ride. Appellant explained the truck he drives is under his mother's name, but he drives it and pays for it. Appellant admitted that he was driving drunk that night after Homie picked them up. Appellant stated that they were about two to three miles from his house when Ms. Valles jumped out of the truck. Appellant explained that when she went out the door it was unlocked, but when he and Homie got out of the truck, one of them accidently hit the lock. Appellant did not know how Ms. Valles fell, but recalled that he drove about 75 to 100 feet before stopping. When Appellant got out of the truck, he had to open the back door to let Homie out on the driver's side. Appellant then shut the door while Homie took off running. Appellant was behind Homie and when he got to the scene, Homie was already holding Ms. Valles. Homie was on his knees, holding her head in his arms. When Appellant got back to the truck it was running, but all the doors were locked, including the passenger side. Appellant stated that after breaking the window with the bloody rock, he cleaned the blood off his hands on his jeans before crawling into the truck through the window. Appellant also stated that he did not report his truck stolen after the incident because he knew Homie had taken it.

During the cross-examination, Appellant conceded that he did not call the police to report his wife was missing, did not call her family, and did not call Ms. Diaz. Appellant admitted that he called his ex-wife Dolores and had told her that things were not going well for him. Appellant admitted that he had lied to his probation officer Ann Marie Richardson about the last time he had seen Ms. Valles. Appellant also admitted that he waited a couple of weeks after returning to the U.S. before turning himself in to the police. Appellant talked to his sister, Leticia Fernandez, while he was in Mexico and knew that the police wanted him for questioning.

Leticia Fernandez testified that before June 16, 2000, her brother was thirty to forty pounds heavier. Ms. Fernandez recalled that her brother had called her and told her that Ms. Valles had jumped out of the truck—information that she relayed to the investigating detective. Appellant was recalled to the stand and testified that he had called his sister and told her that Ms. Valles had jumped out of the truck and that he thought she was dead.

In rebuttal, the State called several witnesses who testified that in their opinions Appellant was not a truthful person. The State also recalled Appellant's ex-wife, Dolores Hinojos, to testify about Appellant's assault on her, which Appellant had described as an accident during his testimony. Hinojos recalled that during an argument in 1993, Appellant picked up one of their children's bicycles and threw it at her. The bicycle hit Ms. Hinojos on the head and caused bleeding. Ms. Hinojos

did not think that the incident was an accident.

The jury found Appellant guilty of murder as charged in Count I of the indictment and assessed punishment at ninety-nine years' imprisonment. Appellant did not file a motion for new trial and now timely appeals his conviction.

## DISCUSSION

### *Territorial Jurisdiction*

In Issue One, Appellant argues that the judgment and sentence are void for lack of territorial jurisdiction. In Issue Two, he argues that he is entitled to an acquittal because the evidence is legally insufficient to establish territorial jurisdiction.

### *Standard of Review*

■ To evaluate the legal sufficiency of the evidence, we view the evidence and reasonable inferences therefrom in the light most favorable to the prosecution to determine whether the verdict is rational. *See Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Teer v. State,* 923 S.W.2d 11, 17 (Tex.Crim.App.1996). The jury is entitled to resolve any conflicts in the evidence, to evaluate the credibility of witnesses, and to determine the weight of particular evidence. *See Jones v. State,* 944 S.W.2d 642, 647 (Tex.Crim.App.1996). Jurisdiction may be established by circumstantial evidence. *Vaughn v. State,* 607 S.W.2d 914, 920 (Tex.Crim.App. [Panel Op.] 1980).

### *Burden of Proof*

To determine whether the evidence is legally sufficient, it is necessary to consider the burden of proof. As the State acknowledges, the Court of Criminal Appeals has not explicitly stated the burden of proof to establish territorial jurisdiction.

In *Vaughn,* the Court considered a complaint that the State "failed to present sufficient evidence" to prove territorial jurisdiction. *Id.* at 919. The Court stated its holding in the following terms: "Viewing the evidence in the light most favorable to the jury verdict below, notwithstanding the circumstantial nature of such evidence ... we believe the jury could have *reasonably concluded* that the deceased was in fact either trampled nearly to death or actually killed in the State of Texas...." *Id.* [Emphasis added][Cite omitted]. The Court further stated, "We believe that jurisdiction, like any other requisite of an offense, can be proven circumstantially and that our holding herein is consistent with the disposition of those cases where the State is compelled to prove up venue in a circumstantial manner." *Id.* at 920. To support this proposition, the Court cited *Edwards v. State,* 427 S.W.2d 629 (Tex.Crim.App.1968). In *Edwards,* the Court held that venue need not be proven beyond a reasonable doubt. Rather, " '[i]t is sufficient if the jury may *reasonably conclude* ... that the offense was committed in the county alleged.' " *Edwards,* 427 S.W.2d at 634. [Emphasis added].

In a later case, the Court held that because venue is not a criminative fact or a constituent element of the offense, it need only be proven by a preponderance of the evidence. This holding was based on *Edwards* and Article 13.17 of the Code of Criminal Procedure. *Fairfield v. State,* 610 S.W.2d 771, 779 (Tex.Crim.App. [Panel Op.] 1981). Article 13.17 expressly provides that venue may be proved by a preponderance of the evidence. TEX.CODE CRIM.PROC.ANN. art. 13.17 (Vernon 1977).

By citing *Edwards* and using its language, *Vaughn* seems to equate the burden of proof for territorial jurisdiction with the burden of proof for venue. Although

Article 13.17 provides a statutory basis for deciding venue by a preponderance of the evidence, there is no comparable statutory basis for deciding territorial jurisdiction by a preponderance of the evidence.

■ There are good reasons not to equate the burdens of proof for venue and territorial jurisdiction. Venue refers to the proper county or place of trial; whereas jurisdiction refers to the power of the court to hear the case. *See Ex parte Watson,* 601 S.W.2d 350, 352 (Tex.Crim. App.1980); *see also People v. McLaughlin,* 80 N.Y.2d 466, 591 N.Y.S.2d 966, 606 N.E.2d 1357, 1359 (1992). As the New York Court of Appeals has stated:

> The distinct conceptual differences between venue and territorial jurisdiction and their different jurisprudential purposes make it virtually impossible to equate the two. Moreover, when measured in terms of the effect on the fundamental rights of the defendant, there is a marked contrast in importance between questions relating to territorial jurisdiction and venue. Whether any conduct has been committed which the State has the power to criminalize and for which it can commence prosecution against the defendant is certainly not commensurate with a question relating solely to the place within the State where the trial should take place.

*McLaughlin,* 591 N.Y.S.2d 966, 606 N.E.2d at 1359.

Most of the states that have considered the issue have concluded that when there is an evidentiary dispute as to whether a crime was committed within the prosecuting state's territorial jurisdiction, the prosecution must prove territorial jurisdiction beyond a reasonable doubt. *See State v. Butler,* 353 Md. 67, 724 A.2d 657, 664 (1999); *McLaughlin,* 591 N.Y.S.2d 966, 606 N.E.2d at 1359–60; *see also* 1 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 4.1(b), at 267 (2d ed. 2003)("[T]he more recent cases have quite consistently held that jurisdiction is a matter which must be proved beyond a reasonable doubt."). *But see United States v. Perrien,* 274 F.3d 936, 939 n.1 (5th Cir.2001)(suggesting that the reasonable-doubt standard only applies if territorial jurisdiction is included as an element of the offense); *People v. Cavanaugh,* 44 Cal.2d 252, 282 P.2d 53, 59 (1955) (holding that territorial jurisdiction need only be proven by a preponderance of the evidence).[1] Professor LaFave explains why the reasonable-doubt standard is appropriate:

> Use of the beyond a reasonable doubt standard minimizes the possibility that a defendant will be tried in one state for a crime actually committed elsewhere. Moreover, it makes it more likely that other states will afford full faith and credit to decisions regarding criminal jurisdiction, even though they are not constitutionally required to do so. There is also the practical consideration that using a lesser standard for a portion of the prosecution's case and the beyond a reasonable doubt standard for the rest would doubtless create confusion in the minds of jurors.

LAFAVE, *supra,* § 4.1(b), at 267. [Footnotes omitted].

While sound policy considerations support applying the reasonable-doubt standard to territorial jurisdiction, in light of *Vaughn* it is difficult to say what standard

---

1. There is an important corollary to the rule that territorial jurisdiction must be proved beyond a reasonable doubt. The rule only applies if there is a factual dispute regarding territorial jurisdiction and the matter has been put in issue by the defendant. *See Butler,* 724 A.2d at 663; LAFAVE, *supra,* § 4.1(b), at 265. If no dispute exists, the court need not submit the issue to the jury. *See Butler,* 724 A.2d at 661–62.

applies in Texas. Nevertheless, for the reasons explained below, we conclude that the evidence is legally sufficient to establish territorial jurisdiction in Texas regardless of the standard that is applied.

### Evidence that Valles' Death Occurred in This State

■ Texas has territorial jurisdiction over an offense if "either the conduct or a result that is an element of the offense occurs inside this state." TEX.PEN.CODE ANN. § 1.04(a)(1)(Vernon 2003). If the offense is criminal homicide, "result" means "either the physical impact causing death or the death itself." TEX.PEN.CODE ANN. § 1.04(b). Thus, Texas had territorial jurisdiction to prosecute this murder if Valles' death occurred in this state. Appellant argues that there is no evidence that Valles died in Texas.

The State presented evidence that Valles was last seen alive in Northeast El Paso in the early morning hours of June 16, 2000. Her dead body was later pulled from the Rio Grande River behind a restaurant located in El Paso on June 28, 2000. The medical examiner testified that Valles died from a head injury, not from drowning. He estimated that the body had been in the water for more than two weeks, thus indicating that she died very soon after she was last seen alive. From this evidence, a rational jury could have found beyond a reasonable doubt that Valles died in El Paso, Texas.

The State also presented evidence that the murder weapon and other items associated with the murder were found in Mexico. But this evidence does not compel a conclusion that Valles was killed in Mexico. The jury could have reasonably inferred that Appellant simply disposed of these items there. To be legally sufficient, the evidence need not exclude all reasonable alternative hypotheses. *See Geesa v.*

*State,* 820 S.W.2d 154, 155, 161 (Tex.Crim. App.1991), *overruled in part on other grounds by Paulson v. State,* 28 S.W.3d 570 (Tex.Crim.App.2000).

Appellant testified that Valles injured herself when she jumped out of his truck approximately two or three miles from his home in Chaparral, New Mexico. His testimony indicates that Valles was alive but unconscious when he last saw her. Although this testimony presents some evidence that the fatal injury occurred in New Mexico, it does not establish that Valles *died* in New Mexico. Moreover, the jury was free to disregard Appellant's testimony.

In short, the circumstantial evidence— viewed in the light most favorable to the prosecution and with proper respect for the jury's power to resolve conflicts, evaluate credibility, and weigh the evidence— supports a finding that Valles died in Texas beyond a reasonable doubt. Therefore, Texas has territorial jurisdiction.

### Evidence That Valles' Body Was Found in This State

■ "If the body of a criminal homicide victim is found in this state, it is presumed that the death occurred in this state." TEX.PEN.CODE ANN. § 1.04(b). Therefore, even if there were no evidence that Valles' death occurred in Texas, this state may still exercise territorial jurisdiction if her body was found in this state.

Detective Ruiz gave the following testimony:

Q: Were you called out June 28, 2000, to 1720 West Paisano?

A: Yes, I was.

Q: Where is that located?

A: It's just a little bit west of downtown El Paso.

Q: Is it in El Paso County?

A: Yes, ma'am.

Q: The state of Texas?

A: Yes, ma'am.

Q: When you arrived—what is located there?

A: The main, I guess landmark that somebody can pick up, it was right behind the La Hacienda Restaurant.

Q: On the west side of town?

A: Yes, ma'am.

Q: When you arrived there, what did you find?

A: I arrived there with reference to a body that had been pulled out of the canal. When I got there, the body had already been removed from that canal, and it was covered with a sheet, laying on the roadway.

Officer Monday testified:

Q: Okay. On June 28, were you called out to take photographs of the body that was found?

A: Yes. On June 28, I went out to the levee road, if you will—it's behind the La Hacienda Café on West Paisano Street—on a body of a female that had been pulled from the river that day.

He later identified teeth that were collected from the skull "that was from the body removed from the levee that day from the river [sic]." The parties entered into a stipulation that "the individual found dead on June 28, 2000 in the Rio Grande River near 1720 West Paisano is Maria Jovita Valles." This stipulation was admitted into evidence.

The testimony of Detective Ruiz and Officer Monday establishes that they found Valles' body on a road behind a restaurant located at 1720 West Paisano in El Paso County, Texas. Thus, the body was "found in this state" within the meaning of Section 1.04(b).

Appellant argues that the evidence is insufficient to establish that the body was found in Texas because the body was in the Rio Grande River before it was found by the officers. He points out that the middle of the River is the boundary between the United States and Mexico. *See* Treaty to Resolve Pending Boundary Differences and Maintain the Rio Grande and Colorado River as the International Boundary, Nov. 23, 1970, U.S.-Mex., art. II, para. A, 23 U.S.T. 371. Appellant argues that the State was therefore required to show that the body was pulled from the Texas side of the River. We disagree. There is no evidence that the body had been on the Mexican side of the River. It is reasonable to infer that Valles' body was found on the Texas side of the River because it was pulled to land in Texas. The stipulation supports this inference by stating that the body was "in the Rio Grande River *near* 1720 West Paisano." [Emphasis added].

We conclude that the evidence is legally sufficient to establish that Valles' body was found in this state, that the State was therefore entitled to the benefit of the presumption that Valles' death occurred in this state, and that Appellant failed to rebut the presumption. Therefore, Texas has territorial jurisdiction.[2]

*Public Policy*

 The conclusion that Texas has territorial jurisdiction in this case comports

---

2. Although the State asserted during its closing argument that Texas has territorial jurisdiction because Valles' body had been found in Texas, the court did not instruct the jury regarding the Section 1.04(b) presumption. *See* Tex.Pen.Code Ann. § 2.05 (Vernon 2003) (requiring the court to instruct the jury regarding presumptions). On appeal, Appellant does not argue that the State cannot rely on the presumption because it was not included in the jury charge; he only argues that there is no evidence to establish the presumption.

with the purpose of Section 1.04 in general and Section 1.04(b) presumption in particular. Section 1.04 was derived from the Model Penal Code. *See* LaFave, *supra*, § 4.4(b) *passim* & n. 52. Before the development of the Model Penal Code and the enactment of Section 1.04, the determination of territorial jurisdiction was governed by a narrow set of rules that were based on the notion that each crime has only one situs. *See id.* § 4.4(a), at 295; Tex.Pen. Code Ann. § 1.04, practice commentary (Vernon 1974).

The territorial jurisdiction provisions of the Model Penal Code and Section 1.04 were designed to broaden the concept of territorial jurisdiction. *See* LaFave, *supra*, § 4.4(b) *passim; see also* 6 Michael B. Charlton, Texas Practice: Texas Criminal Law § 1.3 (2001) (commenting that Section 1.04 broadly defines the state's territorial jurisdiction). According to the practice commentary for Section 1.04:

> Section 1.04 departs from prior law, which limited jurisdictional provisions to specific offenses, by establishing a broad jurisdictional base for the prosecution in Texas of offenses involving persons, property, and public interests in this state.... The section includes all jurisdictional provisions in prior law and in some instances (*e.g.,* prosecution for homicide when the body is found in the state) broadens that jurisdiction. The primary policy considerations underlying this section are (1) the state seeking to prosecute for an offense should have a substantial interest in or connection with the criminal event, and (2) law enforcement should be facilitated by plugging gaps in the existing law when a course of conduct goes beyond the boundaries of a single state. A basic tenet of Section 1.04 is that an actor's location within or without the state when the offense is committed and his legal relation to the offense (perpetrator or party) are immaterial for jurisdictional purposes if the formal requisites of the statute are met. [Citation omitted].

Tex.Pen.Code Ann. § 1.04, practice commentary; *see also Devine v. State,* 786 S.W.2d 268, 270 (Tex.Crim.App.1989)(gleaning legislative intent from a practice commentary).

The first policy underlying Section 1.04 is that the prosecuting state should have a substantial interest in or connection with the crime. *See* Tex.Pen.Code Ann. § 1.04, practice commentary. This policy is founded on due process. *See* Charlton, *supra*, § 1.3. Texas certainly has a substantial interest in and connection with this crime. Valles was living in Texas when she was murdered and was last seen alive in Texas. Her disappearance was therefore investigated by Texas law enforcement personnel, who eventually discovered her dead body in Texas.

■ The second policy underlying Section 1.04 is that jurisdictional gaps should be plugged. *See* Tex.Pen.Code Ann. § 1.04, practice commentary. One of the ways in which Section 1.04 accomplishes this objective is through the presumption that death occurred in this state if the body was found in this state. This presumption is based on the idea that a person should not be able to avoid or delay prosecution, and thereby confound justice, by murdering the victim in one jurisdiction and placing the dead body in another. *See McKinney v. State,* 553 N.E.2d 860, 862 (Ind.Ct.App.1990)(construing a comparable statute). This is particularly important in El Paso County, where the Rio Grande River forms the border separating Texas from Mexico. Appellant argues that Texas cannot prosecute him because Valles' body *may* have been on the Mexico side of the River before it was found by law enforcement personnel in Texas. This argument

makes jurisdiction dependent upon nice distinctions regarding the positioning of the body and the vagaries of the Rio Grande River, effectively turning the River itself into a jurisdictional gap. The argument is thus inconsistent with the purpose of Section 1.04. Accordingly, Issues One and Two are overruled.

### Motion for Directed Verdict and Ineffective Assistance of Counsel

■ In Issue Three, Appellant argues that the trial court erred in not allowing his counsel to renew his motion for directed verdict because the evidence was legally and factually insufficient to prove the offense occurred in El Paso County. Appellant asserts that if defense counsel had been given the opportunity to make his motion for directed verdict, he clearly would have raised venue and jurisdiction matters to preserve the issue for review. In Issue Four, Appellant asserts that by failing to object to the trial court's refusal to allow him to renew his motion and by not specifically alleging the State's failure to prove venue in his first motion for directed verdict, his trial counsel provided ineffective assistance of counsel. Since both issues presented concern venue in this cause we will address the issues together.

In the State's response, it argues the trial court did not refuse to allow defense counsel to renew the motion, but rather expressly overruled the renewed motion itself. We agree. At the close of evidence, the following exchanged occurred:

Defense counsel: I would just ask to renew our motion for acquittal.

The Court: You mean the motion for directed verdict?

Defense counsel: Yes.

The Court: Denied. We are going to proceed.

From the context of the ruling, it appears to this Court that the trial court was expressly denying Appellant's motion for directed verdict. In Appellant's first motion for directed verdict, made at the close of the State's case-in-chief, defense counsel argued that there was insufficient circumstantial evidence to show that Appellant killed the victim. The trial court denied that motion and apparently denied the motion for a second time. Issue Three is overruled.

Appellant asserts in Issue Four that he was provided ineffective assistance of counsel because his counsel was deficient and not reasonably effective due to failure to specifically allege the lack of proof on venue in El Paso County in the motion for directed verdict.

We review claims of ineffective assistance of counsel under the two-prong test set out by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and adopted by Texas in *Hernandez v. State,* 726 S.W.2d 53, 57 (Tex.Crim.App. 1986). First, the defendant must show that trial counsel's performance was deficient, that is, counsel's representation fell below an objective standard of reasonableness. *Thompson v. State,* 9 S.W.3d 808, 812 (Tex.Crim.App.1999); *Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2064. Second, the defendant must show that counsel's deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Jackson v. State,* 877 S.W.2d 768, 771 (Tex.Crim.App.1994). This requires the defendant to show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Jackson,* 877 S.W.2d at 771. A reasonable probability is a probability sufficient to undermine confidence in the out-

come. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Jackson,* 877 S.W.2d at 771.

■ It is the defendant's burden to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson,* 9 S.W.3d at 813. In reviewing a claim of ineffective assistance of counsel, we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and the appellant must overcome the presumption that the challenged conduct might be considered sound trial strategy. *Id.; Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Any allegation of ineffectiveness must be firmly founded and affirmatively demonstrated in the record to overcome this presumption. *Thompson,* 9 S.W.3d at 813; *see Jackson,* 877 S.W.2d at 771. In the majority of instances, this task is extremely difficult because "the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel." *Thompson,* 9 S.W.3d at 813–14. When faced with a silent record as to counsel's strategy, this Court will not speculate as to the reasons for counsel's actions. *See Jackson,* 877 S.W.2d at 771. The Court of Criminal Appeals in *Thompson,* further advises that "[a]n appellate court should be especially hesitant to declare counsel ineffective based upon a single alleged miscalculation during what amounts to otherwise satisfactory representation, especially when the record provides no discernible explanation of the motivation behind counsel's actions—whether those actions were of strategic design or the result of negligent conduct." *Thompson,* 9 S.W.3d at 814. In this case, Appellant did not file a motion for new trial to challenge the alleged ineffectiveness of his counsel. The record before this Court does not contain trial counsel's explanations of the reasons for the inaction alleged as error, therefore it will be difficult for Appellant to rebut the strong presumption that trial counsel's conduct falls within the wide range of reasonable professional assistance. *See id.*

### *Failure to Challenge Venue in the Motion for Instructed Verdict*

■ Article 13.05 of the Texas Code of Criminal Procedure provides that "criminal homicide committed wholly or in part outside this State, under circumstances that give this State jurisdiction to prosecute the offender, may be prosecuted in the county where the injury was inflicted, or in the county where the offender was located when he inflicted the injury, or in the county where the victim died or the body was found." TEX.CODE CRIM.PROC. ANN. art. 13.05 (Vernon 1977).

Although defense counsel did not challenge the venue issue through his motion for directed verdict, defense counsel in his closing argument argued at length that the State had failed to prove venue in this case. Defense counsel's jury argument included the following remarks:

> What evidence do you have—has the State produced to you that this—if it was a crime—occurred in Texas? They found a body. However, I think you-all are familiar with the area. The New Mexico line is not too far up from the La Hacienda. It's between—at Anthony, that area. And they never even told you if the body was found on the Mexican side of the river or the American side of the river. Not one officer testified this crime occurred in Texas and the body was actually in Texas. It was just, we know it was in a ditch by the La Hacienda.

> Everybody that's been to the La Hacienda Restaurant knows that on one side is Mexico and on the other side is the United States....

There was nobody here to testify that it was actually on the American side of the river.

Apparently, Appellant's trial counsel brought to the jury's attention the State's alleged failure to prove venue for its determination, rather than asserting this challenge to the trial judge in his motion for instructed verdict. Without any evidence in the record on direct appeal regarding counsel's reasoning of his action or inaction, we find that Appellant has failed to defeat the strong presumption that his trial counsel's performance falls within the wide range of reasonable professional assistance. *See Thompson,* 9 S.W.3d at 814. Appellant's Issue Four is overruled.

### *Sufficiency of the Evidence*

In Issues Five and Six, Appellant challenges the legal and factual sufficiency of the evidence to sustain his conviction for murder.

### *Standards of Review*

As noted above, in reviewing the legal sufficiency of the evidence, we must view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2788–89. We do not resolve any conflict of fact or evaluate the credibility of any witnesses, as this was the function of the trier of fact and will be given great deference. *Adelman v. State,* 828 S.W.2d 418, 421 (Tex.Crim.App.1992); *Matson v. State,* 819 S.W.2d 839, 843 (Tex. Crim.App.1991). Instead, our duty is to determine whether both the explicit and implicit findings of the trier of fact are rational by viewing all of the evidence admitted at trial in the light most favorable to the verdict. *Adelman,* 828 S.W.2d at 421–22. In so doing, any inconsisten-

cies in the evidence are resolved in favor of the verdict. *Matson,* 819 S.W.2d at 843. The same standard of review applies to cases involving circumstantial evidence. *Burden v. State,* 55 S.W.3d 608, 613 (Tex. Crim.App.2001); *Geesa v. State,* 820 S.W.2d 154, 159 (Tex.Crim.App.1991), *overruled in part on other grounds by Paulson v. State,* 28 S.W.3d 570 (Tex.Crim. App.2000).

In reviewing a factual sufficiency challenge, we do not view the evidence in the light most favorable to the verdict. *Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim. App.1996). Rather, we ask "whether a neutral review of all of the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof." *Johnson v. State,* 23 S.W.3d 1, 11 (Tex.Crim.App. 2000). "The court reviews the evidence weighed by the jury that tends to prove the existence of the elemental fact in dispute and compares it with the evidence that tends to disprove that fact." *Id.* at 7. We are authorized to disagree with the fact finder's determination; however, our review must employ appropriate deference to prevent this court from substituting its judgment for that of the fact finder and any evaluation should not substantially intrude upon the fact finder's role as the sole judge of weight and credibility given to any witness testimony. *Id.; Jones v. State,* 944 S.W.2d 642, 647–48 (Tex.Crim. App.1996), *cert. denied,* 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997).

### *Legal Sufficiency*

In Issue Five, Appellant argues that the trial court erred in denying his motion for an instructed verdict. Specifically, Appellant asserts that the State produced no

evidence that would show he had anything to do with the death of his wife.[3] A challenge to the trial court's ruling on a motion for instructed verdict is actually a challenge to the legal sufficiency of the evidence, therefore we apply the same standard of review. *Madden v. State*, 799 S.W.2d 683, 686 (Tex.Crim.App.1990), *cert. denied*, 499 U.S. 954, 111 S.Ct. 1432, 113 L.Ed.2d 483 (1991).

### Murder

■ In this case, the elements of the offense of murder were set out in the indictment which alleged in pertinent part that Appellant did unlawfully then and there:

> [I]ntentionally and knowingly cause the death of an individual, namely, MARIA JOVITA VALLES, by striking the head of MARIA JOVITA VALLES with a rock,
>
> . . .
>
> [D]id then and there, with intent to cause serious bodily injury to an individual, namely, MARIA JOVITA VALLES, commit an act clearly dangerous to human life, to wit: by striking MARIA JOVITA VALLES about the head with a rock, that caused the death of the said MARIA JOVITA VALLES. . . . [4]

*See* TEX.PEN.CODE ANN. § 19.02(b)(1), (2)(Vernon 2003).

The State presented a circumstantial evidence case and as such, the cumulative force of all the surrounding additional facts and incriminating circumstances may be sufficient to support the jury's conclusion of guilt. *See Barnes v. State*, 876 S.W.2d 316, 321 (Tex.Crim.App.1994), *cert. denied*, 513 U.S. 861, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994); *Beardsley v. State*, 738 S.W.2d 681, 685 (Tex.Crim.App.1987).

Viewing the evidence in the light most favorable to the verdict, we find that there was sufficient circumstantial evidence for any rational trier of fact to find the essential elements of the offense of murder, as alleged in Count I of the indictment, beyond a reasonable doubt. Appellant and Ms. Valles were married in January 2000, but by June 15, 2000, Ms. Valles had recently moved out of the marital home. On the evening of June 15, 2000, Ms. Valles joined Appellant at the Eldorado Lounge and he paid for her cab ride there. Witnesses who last saw the couple together at the Eldorado Lounge described their interactions as argumentative and as the night progressed, amorous. Appellant and Ms. Valles were seen leaving the bar together, holding hands and walking towards Appellant's truck. This was the last time that Ms. Valles was seen alive. Maria Diaz, Ms. Valles' friend and babysitter for the evening, attempted to return Ms. Valles' two children the next morning, but

---

**3.** We note that in Appellant's brief under Issue Five, he also challenges the legal sufficiency of the evidence regarding jurisdiction and venue. Appellant's jurisdiction complaint has been addressed in our review of his Issues One and Two. In Issue Four, Appellant argued that his counsel's failure to specifically challenge venue amounted to ineffective assistance of counsel. Nowhere in his brief does Appellant argue that counsel has preserved appellate review on the issue of venue. In his motion for instructed verdict, Appellant's trial counsel did not challenge proof of venue and as discussed above in our review of Issue

Four, the record on direct appeal is silent as to trial counsel's reasoning for his action. Therefore, we presume venue was proven in the trial court as the record does not affirmatively show otherwise nor was venue disputed in the trial court. *See* TEX.R.APP.P. 44.2(c)(1); *Valdez v. State*, 993 S.W.2d 346, 349 (Tex. App.-El Paso 1999, pet. ref'd).

**4.** As previously noted, Count II of the indictment was dismissed after the jury found Appellant guilty as alleged in Count I.

found that Ms. Valles was not at her apartment. Ms. Diaz thought this was unusual and later that night called the police to report Ms. Valles as missing. Ms. Valles' body was found two weeks later dressed in the same clothing that witnesses had seen her wearing that night she disappeared.

The State in its case-in-chief also presented physical evidence linking Appellant to the murder weapon alleged in the indictment. Police officers testified that on June 20, 2000, they went to Juarez, Mexico to view a truck found by Juarez police at a bus station on June 16, 2000. This truck was later identified as Appellant's. The officers recovered a pair of bloodstained jeans, size 33 × 32, a heavily bloodstained sharp-edged rock, approximately ten inches long and two to three inches wide, and socks with blood and dirt stains. DNA analysis of the blood on these items was shown to be consistent with the victim's DNA profile. Based on examination of the victim's body, Dr. Juan Contin testified that the only significant injury was a fracture running from the left side of the victim's skull through its base to the other side. The impact of the fracture was on the left side of the skull. Dr. Contin concluded that the victim had died of a head injury and the manner of death was homicidal. Dr. Contin concluded that such an injury would result in a lot of bleeding. Dr. Contin agreed that the rock admitted into evidence was capable of causing death or serious bodily injury. Detention officer Steven Elliot testified that when Appellant was booked into the detention facility upon his arrest, Appellant was wearing a pair of jeans size 33 × 32.

Through testimony from witnesses who had spoken with Appellant while Ms. Valles was missing, the State produced evidence of suspicious conduct by Appellant to indicate a consciousness of guilt. Dolores Hinojos, Appellant's ex-wife, testified that early on the morning of June 16, 2000, she received a telephone call from Appellant asking her to take care of his boys. When Ms. Hinojos asked if something was wrong, Appellant replied that things were not going well for him. Hinojos recalled that Appellant sounded sad and depressed. Ann Marie Richardson, Appellant's probation officer, spoke with Appellant on June 19, 2000, at which time she questioned Appellant about the missing Ms. Valles' whereabouts. Appellant lied to Ms. Richardson and told her he had not seen nor heard from Ms. Valles for a week and a half. Ms. Richardson noticed that Appellant continually referred to Ms. Valles in the past tense, which led her to suspect that Ms. Valles was dead.

Any rational trier of fact could reasonably conclude from the cumulative force of the facts and incriminating circumstances detailed above the essential elements of the offense of murder in this case beyond a reasonable doubt. Appellant was the last to see Ms. Valles, his estranged wife, alive. From his actions after her disappearance, a jury could reasonably infer that Appellant was hiding something or had a consciousness of guilt. Moreover, the physical evidence recovered by police officers pointed to Appellant. Accordingly, we conclude that the evidence is legally sufficient to support Appellant's conviction. Issue Five is Overruled.

*Factual Sufficiency*

In Issue Six, Appellant argues that the entire record, in particular the contradictory evidence presented by Appellant at trial, overwhelmingly contradicts the verdict as to make the verdict wrong and unjust.[5]

5. In its brief, the State contends that because Appellant failed to properly brief his factual sufficiency complaint, nothing is presented for this Court's review. It appears that Ap-

The State presented a circumstantial evidence case in which there was no direct evidence linking Appellant to Ms. Valles' death. Fingerprints collected from Appellant's truck were found to be of no evidentiary value. Appellant's version of events places him, Homie, and Ms. Valles in his pickup truck on the evening of Ms. Valles' death. According to Appellant, Ms. Valles was asking for rent money and wanting to go to Juarez to drink. Inexplicably, Ms. Valles jumped out of Appellant's truck, which was traveling at a high rate of speed. Appellant slowed down his vehicle, put on the parking brake, left the vehicle running, but accidently locked the door. Homie reached Ms. Valles first and held her in his arms. Appellant recalled that there was a lot of blood on the ground. Appellant used a rock covered in Ms. Valles' blood to break the back window of the cab. Before crawling in, Appellant wiped the blood on his hands onto his jeans. After he and Homie loaded Ms. Valles into the bed of the truck, despite Appellant's concern that she had broken her neck in the fall, Homie drove away, while Appellant walked home. From his testimony, Appellant was asking the jury to infer that Ms. Valles' head injury was self-inflicted and that Homie had disposed of her body in the river instead of seeking medical assistance.

■■■ The jury is the sole judge of witness credibility and is free to believe or disbelieve any witness. *Jones v. State,* 984 S.W.2d 254, 258 (Tex.Crim.App.1998); *Sharp v. State,* 707 S.W.2d 611, 614 (Tex. Crim.App.1986), *cert. denied,* 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988). The jury apparently did not accept Appellant's version of events and we give appropriate deference to the jury with respect to credibility and weighing of evidence. Moreover, Appellant's testimony is contrary to the physical evidence recovered from Appellant's truck, namely that tests of the truck's interior found no presence of blood. Considering all the evidence presented at trial, we conclude that the evidence was factually sufficient to support Appellant's conviction because it is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Issue Six is overruled.

### *Circumstantial Evidence Instruction*

■■■ In Issue Seven, Appellant asserts that the trial court erred in refusing his requested instruction on circumstantial evidence. We disagree.

Appellant's counsel requested the following instruction:

> In the circumstantial evidence case, you are instructed that if the evidence supports a reasonable inference other than the defendant's guilt, then the State has failed to meet its burden of proof of the elements of the offense beyond a reasonable doubt. It the evidence supports a reasonable inference other than the defendant's guilt, you will say by your verdict not guilty.

The trial court denied the requested instruction.

The Court of Criminal Appeals in *Hankins,* observed that circumstantial evidence can be as strong and conclusive as direct evidence and that jurors are not required to give greater weight to direct

pellant set out only the factual sufficiency standard of review in Issue Six and by mistake included the argument on this issue at the end of his briefing on Issue Seven. In this particular instance, we will consider the merits of Appellant's factual sufficiency point because it is readily apparent that Appellant intended to provide an argument in support of his factual sufficiency complaint, which appears on pages twenty-three to twenty-six of his brief.

evidence than circumstantial evidence. *Hankins v. State*, 646 S.W.2d 191, 198 (Tex.Crim.App.1983)(Opin. on reh'g), *abrogation on other grounds recognized by Markham v. State*, 751 S.W.2d 190, 192 (Tex.Crim.App.1988). The Court in *Hankins* held that a circumstantial evidence charge is not required, was valueless, and only served to confuse the jury. *Id.* at 198, 199. The Court of Criminal Appeals in *Geesa*, observed its abrogation of the circumstantial evidence charge in its *Hankins* decision. *Geesa*, 820 S.W.2d at 155–56, *overruled in part on other grounds by Paulson v. State*, 28 S.W.3d 570 (Tex.Crim.App.2000)(overruling the reasonable doubt instruction mandated in *Geesa*). In light of these holdings, the trial court did not err in refusing Appellant's circumstantial evidence instruction. Issue Seven is overruled.

Having overruled all of Appellant's issues for review, we affirm the trial court's judgment.