COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| ALBERT MUNOZ, | § | No. 08-07-00325-CR |
| Appellant, | § | Appeal from the |
| v. | § | 112th District Court |
| THE STATE OF TEXAS, | § | of Upton County, Texas |
| Appellee. | § | (TC# 06-05-U810-CAM) |
| | § | |

## **O P I N I O N**

Albert Munoz appeals his capital murder conviction. A jury found Appellant guilty and the court assessed punishment at life in the Institutional Division of the Texas Department of Criminal Justice, without the possibility of parole. We affirm.

## I. **PROCEDURAL AND FACTUAL BACKGROUND**

### **A. Procedural Background**

Appellant Albert Munoz was indicted for capital murder, for intentionally causing the death of Xavier Jonathan Flores, a child under six years. The jury found Munoz guilty of capital murder as charged in the indictment, and the court assessed punishment at life in the Institutional Division of the Texas Department of Criminal Justice, without the possibility of parole. Appellant files this appeal raising four points of error challenging the legal and factual sufficiency of the evidence and the exclusion of testimony of two witnesses.

### **B. Factual Background**

Xavier Jonathan Flores was born March 15, 2005, and died on March 12, 2006, three days prior to his first birthday. He was the youngest of Bobbie Thiesfeld's four children whose age

ranged from two to five years old. Xavier's mother, Bobbie, began living with Appellant, Albert Munoz, in December 2004 prior to Xavier's birth. While in Odessa, Texas, Bobbie, her four children, and Appellant lived with different relatives. In late December 2005 Appellant took Bobbie and her four children to live with his mother and brother in Rankin, Upton County, Texas. In March 2006 Bobbie worked at a local restaurant, and Appellant worked doing contract painting.

On March 12, 2006, Bobbie went to work at 9 or 9:30 a.m. and left her children in the care of Appellant. Appellant's mother Oralia Vasquez left to attend church with Appellant's daughter and returned home around noon. Appellant's brother, who had nothing to do with the children, also left home in the morning. Appellant testified that on that morning he slept until 9:45 at which time he arose and fed the children, including Xavier. This is disputed. Xavier's brother testified that he did not see Appellant feed Xavier, and no food was found in Xavier's stomach at his autopsy. Appellant then went to the living room and played video games while the children slept in the bedroom. Around 12 p.m. Appellant says he went to check on the children and found Xavier either having trouble breathing or not breathing at which point Bobbie was called at work. Appellant's mother returned from church a few minutes later. Bobbie returned home and emergency personnel were called about Xavier's condition. Paramedics arrived shortly thereafter and promptly took Xavier to the medical facility in Rankin. At 12:55 p.m., shortly after arriving at the hospital, Xavier was declared dead. The medical examiner determined that Xavier had died from blunt force trauma to the head with a hemorrhage to the brain and secondary swelling. In addition to the blunt force trauma sustained on the right side of the head, he also had a hemorrhage on the left side, which indicated that the head was in motion when it struck something hard. The medical evidence showed a crescent-shaped injury to the right side of the head and that the skull sutures were greatly separated. The medical examiner concluded that the injury was the result of a "tremendous blow," "a vicious

and violent blow" most likely caused by Xavier's head striking a hard, rounded object, while traveling at great velocity. The medical examiner testified that, "[t]he body has to be literally grabbed by the thorax and then struck extremely hard" and that an adult person would be required to cause that injury. He testified that the injury could have occurred from one to two hours prior to death, and that death likely occurred between thirty minutes and an hour prior to when lividity in the limbs was observed, around 12:25 p.m., the time that Xavier was admitted at Rankin Emergency Room.

After leaving the hospital, Appellant told Bobbie that he had bumped Xavier's head on the bedpost. During an interview with Texas Ranger Jess Malone Appellant admitted to having hit Xavier's head against a bedpost. He stated that he removed the bedpost so it could not happen again because he feared it might be worse next time. The bedpost was located under Appellant's bed where he said he placed it. Appellant denied this at trial. Instead he claimed that he had hit Xavier's head against the bedpost two days before Xavier's death, and that he only represented to Ranger Malone that it had happened the day of Xavier's death because he was unfamiliar with law enforcement and wanted to satisfy Ranger Malone. Appellant denied killing Xavier.

The record indicates that the children were poorly parented. Witnesses with firsthand knowledge testified that Bobbie was a bad parent. At times Bobbie became angry with the children and had been observed striking the oldest child. There was an incident in which Xavier's brother struck him with a plastic bat or a flip-flop (pull toy). Sometime prior to Xavier's death he had been examined by medical personnel at the Rankin Hospital. He had experienced difficulty in keeping his food down and was described as having respiratory problems, i.e., excessive wheezing. Xavier was released. He was described as small for his age and appeared to be malnourished and underfed. The autopsy and postmortem testing established that no physical defect contributed to or caused

Xavier's death. The fact that Xavier was malnourished did not contribute to his death.

## II. DISCUSSION

### A. Sufficiency of the Evidence

In Points of Error One and Two, Appellant challenges the legal and factual sufficiency of the evidence supporting his conviction. Specifically, he alleges that the evidence is legally insufficient to prove *intentional* murder and factually insufficient to convict on capital murder.

### 1. Standards of Review

#### a. Legal sufficiency

In reviewing the legal sufficiency of the evidence to support a criminal conviction, we must review all the evidence, both State and defense, in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Lane v. State*, 151 S.W.3d 188, 191-92 (Tex.Crim.App. 2004). We look at "'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007) (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex.CrimApp. 1985)). We do not resolve any conflict of fact or assign credibility to the witnesses, as it was the function of the trier of fact to do so. *See Adelman v. State*, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992) and *Matson v. State*, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991). Instead, our duty is only to determine if both the explicit and implicit findings of the trier of fact are rational by viewing all of the evidence admitted at trial in a light most favorable to the verdict. *Adelman*, 828 S.W.2d at 422. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict. *Matson*, 819 S.W.2d at 843.

### b. Factual sufficiency

Appellate courts are constitutionally empowered to review the judgment of the trial court to determine the factual sufficiency of the evidence used to establish the elements of an offense. *Johnson v. State*, 23 S.W.3d 1, 6 (Tex.Crim.App. 2000) (citing *Clewis v. State*, 922 S.W.2d 126, 129-30 (Tex.Crim.App. 1996)). In examining the factual sufficiency of the elements of the offense, all evidence is viewed in a neutral light, favoring neither party. *Clewis*, 922 S.W.2d at 129. In performing our review, due deference is given to the fact finder's determinations. *See Johnson*, 23 S.W.3d at 8-9. Evidence may be factually insufficient if it is so weak that it would clearly be wrong and manifestly unjust for the verdict to stand, or "the adverse finding is against the great weight and preponderance of the available evidence." *Johnson*, 23 S.W.3d at 11. The question that must be answered when reviewing factual sufficiency is whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or proof of guilt, although ample if taken alone, is greatly outweighed by contrary proof. *Johnson*, 23 S.W.3d at 11.

Under the first prong of *Johnson*, we cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the amount of evidence admitted, we would have voted to acquit had we been on the jury. *Watson v. State*, 204 S.W.3d 404, 417 (Tex.Crim.App. 2006). Under the second prong of *Johnson*, we cannot declare that a conflict in the evidence justifies a new trial simply because we disagree with the jury's resolution of the conflict. *Watson*, 204 S.W.3d at 417. In order to find that evidence is factually insufficient to support a verdict, we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id*. We give appropriate deference to the jury with respect to credibility and weighing of evidence. *Torres v. State*, 141 S.W.3d 645, 662 (Tex.App.–El Paso

2004, pet. ref'd). The jury is the sole judge of witness credibility and is free to believe or disbelieve any witness. *Id.*

## 2. The Law on Intent

A person commits the offense of murder if he "intentionally or knowingly causes the death of an individual." TEX.PEN.CODE ANN. § 19.02(b)(1) (Vernon 2003). A person commits the offense of capital murder if he commits the offense of murder as defined in section 19.02(b)(1) and "the person murders an individual under six years of age." TEX.PEN.CODE ANN. § 19.03(a)(8) (Vernon Supp. 2008). Appellant was indicted for the offense of capital murder. The indictment alleged that, on or about March 12, 2006, Appellant "intentionally cause[d] the death of . . . Xavier Jonathan Flores, by causing the head of said Xavier Jonathan Flores to suffer blunt force trauma in a manner and means unknown," and that "Flores was then and there an individual younger than six years of age." The application paragraph of the court's charge tracked the indictment. The court's charge and the relevant portion of Texas Penal Code Section 6.03(a) define the culpable mental state of intentionally as "[a] person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result." "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor." *Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004). Circumstantial evidence alone may be sufficient to establish guilt. *Id.* "[T]he standard of review on appeal is the same for both direct and circumstantial evidence cases." *Id*.

## 3. Analysis of the Evidence

### a. Legal sufficiency

After a careful review of all the evidence, we find that the evidence is legally sufficient to find beyond a reasonable doubt that Appellant intentionally caused Xavier's death by blunt force

trauma to the head. The jury was free to believe the medical testimony that the injury must have occurred during the time that Appellant was the only adult in the house with Xavier. Dr. Nizam Peerwani, the medical examiner, testified that the injury could have occurred from an hour to two hours prior to death, and that death likely occurred between thirty minutes and an hour prior to when lividity in the limbs was observed at the Rankin Emergency Room, which was sometime around 12:25 p.m. This places the time of the fatal injury sometime between 9:30 a.m. and 11 a.m. Bobbie left for work sometime between 9 a.m. and 9:30 a.m. Appellant's mother left the house for church at 9 a.m. Appellant testified that he fed Xavier at 9:45 a.m. It would have been impossible for Appellant to feed Xavier had the injury been inflicted by another adult before leaving the house. Dr. Peerwani's testimony was that Xavier would have lost consciousness very rapidly after being struck if not at the moment of impact. Based on this evidence, a rational jury could find that Appellant was the only adult in the house when the fatal blow occurred.

Dr. Peerwani indicated that the fatal injury was probably caused by an adult person able to carry an infant and strike the head on a hard object and that the injury was most likely caused by the baby's head itself being put into great velocity and struck into a hard object, as if swung by the thorax. He testified that the damage to the baby's skull and brain was too severe to have been caused by another child, a fall, or being dropped. The evidence establishes that the Appellant was the only person in the house capable of inflicting the fatal injury. Furthermore, Appellant admitted to the Rangers and to Xavier's mother that he hit Xavier's head against a bedpost and that he removed the bedpost and placed it under his bed, where it was later recovered. Dr. Peerwani testified that the bedpost's shape and hardness could have caused the crescent-shaped fracture in Xavier's skull.

We do not agree that the evidence is legally insufficient to prove *intentional* murder. Intent can be inferred from the extent of the injuries to the victim, the method used to produce the injuries,

and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex.Crim.App. 1995). Dr. Peerwani testified that the fatal blow to Xavier's head must have been "tremendous" and "vicious and violent." He described in detail the severe damage to Xavier's skull and brain including a two-inch fracture in the skull, the "greatly separated" sutures of the skull, the hemorrhaging of the brain on both the side of the head where he was struck, and the opposite side where the brain impacted the skull after the initial blow, called the coup and contra-coup. He explained that based on the coup and contra-coup it was very likely that the baby's head itself was in great velocity when it struck a hard, unyielding surface. Dr. Peerwani made it clear that it would take the strength of an adult to inflict this much damage. In this case, not only is the severity of the wound on its own legally sufficient to support a finding of intent to cause death when considered along with the method used to produce the injury and the relative size and strength of the parties, there clearly exists legally sufficient evidence to support a finding of intent. "Intent can be inferred from the acts, words, and conduct of the accused." *Patrick* 906 S.W.2d at 487. Appellant did not summon medical aid after injuring Xavier. Instead, Appellant removed the bedpost and placed it under his bed. Appellant lied about having fed Xavier breakfast. Appellant failed to inform the EMTs and the doctors at the hospital that Xavier had suffered head trauma. The requisite intent could be inferred by a rational jury from several items of evidence. *Patrick*, 906 S.W.2d at 487. We conclude the evidence is legally sufficient. Taking the evidence in the light most favorable to the verdict we determine that a rational jury could have found beyond a reasonable doubt that Appellant intentionally caused Xavier's death.

**b. Factual sufficiency**

We find that the evidence is factually sufficient to convict Appellant of the offense of capital murder of a child under six. We review the evidence in detail. In an effort to cast suspicion on

others, Appellant points to some evidence that Bobbie was abusive and neglectful toward the children and that Xavier's brother had struck Xavier with some of his toys. However both of these persons and their actions are exculpated by the testimony that establishes the injury occurred while Appellant was the only adult present with the children and that establishes an adult's strength was necessary to produce the injury. Appellant denies that he hit Xavier's head on the day of the child's death, but the medical testimony establishes otherwise.

Dr. Peerwani testified that Xavier's head was likely swung at great velocity and struck against an object with an adult's strength, in a "tremendous" and "vicious and violent" blow and that death would have occurred within one to two hours. The jury was free to disbelieve Appellant's testimony that he did not hit Xavier's head the day of the baby's death, and that if he did hit Xavier's head it was accidental. Appellant's testimony does not outweigh the medical and physical evidence. Dr. Peerwani characterized the explanation of an accidental bumping as a "totally unacceptable explanation for a skull fracture." There is no contrary evidence which greatly outweighs the jury's determination that Appellant intentionally caused Xavier's death, nor is there any evidence that indicates the conviction is clearly wrong or manifestly unjust. The aggravating circumstance required by Texas Penal Code Section 19.03(a)(8) was clearly met. Xavier was eleven months and some days old; a child under six years of age. We find the evidence is factually sufficient to support the guilty verdict for capital murder. Points of Error One and Two are overruled.

### B. Exclusion of Witnesses' Testimony

In Points of Error Three and Four, Appellant argues that the trial judge erred in refusing to allow a CPS worker to testify as to CPS's recommendation for the children's placement, and Dr. Jarvis Wright to testify as an expert in the field of false confessions.

### 1. Standard of Review

We review a trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *See Levario v. State*, 964 S.W.2d 290, 296 (Tex.App.–El Paso 1997, no pet.). The trial court's rulings should be sustained on appeal if correct on any theory of law applicable to the case. *Weatherred v. State*, 975 S.W.2d 323, 323 (Tex.Crim.App. 1998). As long as the trial court's ruling was within the zone of reasonable disagreement, the decision will be upheld. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990) (opin. on reh'g); *Levario*, 964 S.W.2d at 297.

## 2. The Law on Relevant Evidence

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R.EVID. 401. "Evidence which is not relevant is inadmissible." TEX.R.EVID. 402. "It is important, when determining whether evidence is relevant, that courts examine the purpose for which the evidence is being introduced." *Layton v. State,* 280 S.W.3d 235, 240 (Tex.Crim.App. 2009) (citing *Moreno v. State*, 858 S.W.2d 453 (Tex.Crim.App. 1993)). "It is critical that there is a direct or logical connection between the actual evidence and the proposition sought to be proved." *Layton*, 280 S.W.3d at 240.

## 3. Examination of Tashani Fernandes's Testimony

In Point of Error Three, Appellant argues that the trial judge erred in refusing to allow Tashani Fernandes's testimony. Tashani Fernandes was a CPS caseworker assigned to Bobbie's case. She was called to testify about the department's recommendation for the children. On *voir dire*, Ms. Fernandes testified that CPS recommended the children be adopted by other family members rather than reunited with Bobbie. There was no testimony as to the reasoning behind CPS's decision. Ms. Fernandes was assigned to Bobbie's case after Xavier's death, and had no firsthand knowledge of his death. The State objected to the relevance of Ms. Fernandes' testimony

and the trial court sustained the objection.

At the outset, it is incumbent on Appellant to demonstrate in what respect the proffered evidence had a tendency to make more or less probable a fact of consequence in the case. TEX.R.EVID 401. At trial, defense counsel argued that Ms. Fernandes' testimony was "relevant to the whereabouts of the children." If the purpose of introducing CPS's recommendation was to establish the whereabouts of the children, it is difficult to understand how their whereabouts during a point in time when the Appellant had been left in charge of the children makes a fact of consequence as to Appellant's defense more or less probable. There is no logical connection between CPS's recommendation and the proposition sought to be proved. On appeal Appellant claims that Ms. Fernandes' testimony was relevant because it indicated that Bobbie was unsuitable to care for her children, which could give "the jury some other possible explanation and/or source of injury to XJF [Xavier] from an adult other than Appellant." There was ample testimony presented by others with firsthand knowledge that Bobbie was a bad parent. Once again, CPS's recommendation does not have any direct or logical connection to the proposition that some other adult caused the injury to Xavier. The trial court's ruling that Ms. Fernandes' testimony was irrelevant is not outside the zone of reasonable disagreement. The trial court did not abuse its discretion in excluding it. Point of Error Three is overruled.

**4. The Law on Expert Testimony**

The Texas Rules of Evidence set out three separate requirements regarding admissibility of expert testimony. First, TEX.R.EVID. 104(a) requires that "[p]reliminary questions concerning the qualification of a person to be a witness . . . be determined by the court. . . ." Second, TEX.R.EVID. 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by

knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." And third, TEX.R.EVID. 401 and 402 render testimony admissible only if it "tend[s] to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Vela v. State*, 209 S.W.3d 128, 130-31 (Tex.Crim.App. 2006). We will review the second requirement, TEX.R.EVID. 702.

A trial court's task under TEX.R.EVID. 702 is to determine whether the proffered expert testimony "is sufficiently *reliable* and relevant to help the jury in reaching accurate results." *Kelly v. State*, 824 S.W.2d 568, 572 (Tex.Crim.App. 1992) (emphasis added). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court called on trial judges to serve as gatekeepers to separate good science that can assist the trier of fact in understanding and determining issues of fact from novel or untested scientific theory that may mislead the fact finder. "Unreliable . . . scientific evidence simply will not assist the [jury] to understand the evidence or accurately determine a fact in issue; such evidence obfuscates rather than leads to an intelligent evaluation of the facts." *Kelly*, 824 S.W.2d at 572. "[E]vidence derived from a scientific theory, to be considered reliable, must satisfy three criteria in any particular case: (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Kelly*, 824 S.W.2d at 573. All three criteria must be proven to the trial court, outside the presence of the jury, before the evidence may be admitted. *Kelly*, 824 S.W.2d at 573.

Factors that could affect a trial court's determination of reliability of a scientific theory include, but are not limited to, the following: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert(s) testifying; (3) the existence of literature

supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Kelly*, 824 S.W.2d at 573. Before novel scientific evidence may be admitted under TEX.R.EVID. 702, the proponent must persuade the trial court, by clear and convincing evidence, that the evidence is reliable and therefore relevant. *Kelly*, 824 S.W.2d at 573.

## 5. Examination of Dr. Jarvis Wright's Testimony

In Point of Error Four, Appellant argues that the trial judge erred in refusing to allow Dr. Jarvis Wright's testimony relating to the field of false confessions. The testimony was intended to rebut the confession and Appellant's admission that he hit Xavier's head on a bedpost.

At the hearing conducted outside the presence of the jury, Dr. Wright testified that the field of false confessions was a relatively new area and an emerging field with which Dr. Wright was familiar by having read recent literature. Dr. Wright explained that psychologists in the field have identified several factors which indicate an increased likelihood that a given confession is false. These factors included the interrogation techniques used, low intelligence, lack of familiarity with law enforcement, and susceptibility to suggestion. Appellant did not intend to ask Dr. Wright to give an opinion as to the truth or falsity of Appellant's confession, but only to testify to a theory that false confessions occur and that the existence of certain factors make it more likely that a specific confession is false. Dr. Wright never interviewed, observed, or tested Appellant, nor had he ever written on, or conducted any testing in the field of false confessions. Dr. Wright's qualification to testify as an expert was that he had read literature on the topic and the basis of his testimony was that he had reviewed Appellant's confession and school records.

Based on our evaluation of the testimony and application of the *Kelly* factors for reliability of scientific theory, we find that the Appellant did not meet his burden of providing by clear and convincing evidence that Dr. Wright's testimony was reliable and therefore relevant. Dr. Wright's testimony could not have assisted the jury in understanding the evidence or in making a determination of a fact issue. Dr. Wright did not intend to offer an opinion as to the truth or falsity of the Appellant's confession. During cross-examination Appellant admitted the truth of the portions of his confession that he earlier claimed were inaccurate. The trial court's decision to exclude Dr.

Wright's testimony regarding false confessions is within the zone of reasonable disagreement. The trial court did not abuse its discretion in excluding it. Point of Error Four is overruled.

### III. CONCLUSION

The evidence in this case was legally and factually sufficient to support Appellant's conviction for capital murder. The trial court committed no error in excluding the testimony of Tashani Fernandes and Dr. Jarvis Wright. Appellant's four points of error are overruled and the trial court's judgment is affirmed.

GUADALUPE RIVERA, Justice

August 19, 2009

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)