COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| DA-NA ALLEN, | | No. 08-07-00326-CR |
| | § | |
| Appellant, | | Appeal from the |
| | § | |
| V. | | 205th  District Court |
| | § | |
| THE STATE OF TEXAS, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC#20060D02219) |
| | § | |
| | § | |

## **O P I N I O N**

Da-na Allen appeals his conviction for murder.  A jury found Appellant guilty, and the court assessed punishment at 38 years' imprisonment.  Finding no reversible evidentiary error, and overruling Appellant's legal and factual sufficiency challenges, we will affirm.

On February 28, 2006, Teresa McCowan Allen was found beaten to death, lying underneath a semi-truck trailer at a truck stop near Interstate 10 in Soccoro, Texas.  The area consists of roadside motels, a bar known as "Sal's Lounge," a McDonald's restaurant, and other roadside businesses.  It is known to be home to a number of homeless men and women, who frequently live in the vacant desert area beyond the businesses and restaurants.  The responding officers noted a pool of blood under the victim's head, and due to the body's location, began investigating the scene as a hit-and-run motor-vehicle accident.  The first officers to arrive on the scene also noticed that the woman's jacket was pulled up, as if she had been dragged, and testified that aside from some shards of broken plastic, which may have broken off a vehicle, there were no tire tracks or other signs of a vehicle accident.

The woman did not have any identification, but the officers did find a key to room forty-six in the nearby Deluxe Inn in her pocket. After securing the scene, the officers contacted the manager on duty at the motel. The manager confirmed that a man and woman had been living in the room for about six months. The couple paid "daily rent" for the room. The manager escorted the officers to the room, and after the officers knocked on the door for approximately five minutes with no response, the manager opened the room with his own key. Inside, there was a chair positioned against the door, and Appellant was lying on the bed. The officers asked Appellant if anyone else lived in the motel room with him, and he told them his wife lived there also. When they asked when Appellant had last seen his wife, Appellant said he had not seen her in over two days. When Appellant's description of his wife's clothing matched that of the victim, the police confirmed the identification and informed Appellant that his wife had been found dead nearby. During the conversation, Appellant remained calm and seemed more concerned with getting to the motel manager's office to purchase cigarettes.

Once the body was transferred to the morgue for autopsy, the medical examiner determined the injuries were not consistent with a hit-and-run, and ruled Mrs. Allen's death a homicide. According to the medical examiner, the victim had three well defined lacerations on her head. He testified they were most likely caused by a heavy metal instrument's impact. One of the blows had been inflicted with such force that her scalp had split open and separated from the skull. Another impact had fractured the skull and sent a piece of bone into the victim's brain. She also suffered five broken ribs, and her abdominal organs showed extensive hemorrhaging. The examiner testified that although the head wounds were consistent with a metal instrument similar to a tire iron, the other injuries were caused by numerous blows with a fist. There also

were a number of surface abrasions on the body, as if she fallen to the ground over dirt or gravel. Based on the hemorrhaging around the fractures and the organ damage, the examiner testified that she was alive when she suffered the injuries. The swelling in her brain indicated that she survived between half an hour and three hours after the injuries. Although a toxicology report showed traces of methamphetamine, amphetamine, cocaine, and a cocaine by product called benzoylecogonine, the examiner concluded the reported levels were relatively low, and that the victim was not high at the time of her death. Ultimately, the examiner concluded that the cause of Mrs. Allen's death was multiple blows to the head with a tire iron, or an other similar metal object. Her death was ruled a homicide. The autopsy report was completed on March 1, 2006.

After receiving the medical examiner's findings, El Paso County Sheriff's Department investigators returned to the truck stop to conduct preliminary interviews with local residents to determine if anyone had any information about Mrs. Allen's death. Detective Terrazas and Detective Arriola went back to the area behind the McDonald's restaurant and concentrated the search back toward the Deluxe Inn. They encountered Ms. Elva Sanchez and Ms. Tina Bommarito in the desert behind the McDonald's. The detectives also encountered two men whom other officers had talked to during the initial crime scene investigation, living near the Deluxe Inn.

The following day, Ms. Bommarito contacted police with information about Mrs. Allen's death. At trial, Ms. Bommarito testified that she met Mrs. Allen in the area near the McDonald's when they were both working as prostitutes at the truck stop. In the community, Ms. Bommarito was known as "Qualified," and Mrs. Allen was known as "Runaway." Ms. Bommarito testified that "Dakota," Appellant's nickname in the area, introduced himself to her in Sal's Lounge on

-3-

February 28, 2006. Ms. Bommarito said she remembered the date because everyone was partying for Mardi Gras. Ms. Bommarito testified that Appellant introduced himself and told her he knew she and his wife had "gotten into it" before, and that Ms. Bommarito did not need to worry about his wife anymore because she was dead. At that point, all Ms. Bommarito knew was that Mrs. Allen had been found dead nearby.

Ms. Bommarito explained that she and Mrs. Allen did not get along. The two women had gotten into an argument in 2005 over a customer or "John" and Ms. Bommarito tried to stab Mrs. Allen because the "John" had taken Mrs. Allen instead of her. Ms. Bommarito was prosecuted for unlawfully carrying a weapon following the attack. After the incident, Ms. Bommarito only spoke to Mrs. Allen one other time when she was walking out of the desert behind the McDonald's and saw Mrs. Allen sitting on a rock. When Mrs. Allen looked up, the women exchanged a few words to each other, and Ms. Bommarito noticed that Mrs. Allen's face bore the injuries of a severe beating.

Ms. Elva Sanchez, known in the community as "Little Bit" or "Polla," also lived in the desert behind McDonald's. She testified that she knew "Dakota" and "Runaway" were married, that the couple sold drugs, and that "Runaway" prostituted to make money. Ms. Sanchez explained that Mrs. Allen was rarely seen without her husband nearby, and that she would try to hide when the couple had an argument. Even when Mrs. Allen was working, Appellant stayed near the trucks. Ms. Sanchez testified that Mrs. Allen would not speak to her in front of Appellant, and that she saw Appellant beat Mrs. Allen several times prior to Mrs. Allen's death. Ms. Sanchez also heard Appellant threaten his wife and call her names. Appellant never let his wife go anywhere by herself, and when Mrs. Allen would leave town to get away, he would find

her and bring her back.

Ms. Sanchez saw the couple together in the late afternoon on the day Mrs. Allen was killed. She remembered that Mrs. Allen had scratches on her face, and that she was walking in front of her husband, kicking the dirt as she went. Ms. Sanchez asked Mrs. Allen what was wrong, and Mrs. Allen just put her head down and said, "Nothing Polla, no," and then walked away. Later that evening, Ms. Sanchez saw the police lights and learned that Mrs. Allen was dead.

Willard Crosby, Jr. rented a room to Appellant and Mrs. Allen in his trailer for approximately six months during 2005. The couple paid rent by supplying Mr. Crosby with cocaine. He and Appellant often panhandled together in order to make money. Mr. Crosby testified that during the time the couple lived with him, they fought constantly. He also testified that he found out about Mrs. Allen's death the day after she was murdered. Appellant told Mr. Crosby that he killed his wife in their motel room and then dumped the body.

Monica Cebollos and Robert Austin worked in businesses near the truck lot where Mrs. Allen's body was found. Ms. Cebollos worked in the McDonald's in early March 2006, and testified that although she did not know who Mrs. Allen was at the time, she had seen Mrs. Allen in the restaurant on a few occasions. She was working a 5 p.m. to midnight shift the day of the murder, and told investigators that she saw one of the "regulars," who was later identified as Appellant, in the restaurant at approximately 7 p.m., and remembered he was alone.

Robert Austin was a manager at the Deluxe Inn where Appellant and his wife lived for six to eight months. He testified that during the time the couple lived at the motel, he occasionally saw Mrs. Allen with bruises on her body, and once he saw her with a black eye.

When asked about the couple's relationship, he stated that "[s]ometimes it was a good relationship. Sometimes there was a bad relationship." On two occasions, Mr. Austin called the room where Appellant and his wife stayed out of concern for Mrs. Allen's safety. On the first occasion, Mr. Austin noticed a "suspicious" hole in the room's window, and although the lights were off, he knocked on the door to make sure everyone was alright. When there was no response to his knock, Mr. Austin went back to his office to call the room. Eventually, Appellant answered the phone. Mr. Austin asked if everything was alright, and if he could speak to Mrs. Allen because he was concerned about her safety. Mr. Austin heard Appellant say to his wife, "[t]he guy in the office, talk to the mother-fucker in the office. He wants to make sure you are okay." Mr. Austin heard Mrs. Allen say something in the background before Appellant told him Mrs. Allen did not want to talk to him. Because he heard Mrs. Allen's voice, Mr. Austin did not feel the need to continue the conversation, and he hung up the phone. On another occasion, Mr. Austin received a phone call from the couple's room, and although he did not testify what, if anything the caller said to him, he did see the couple leave the room thirty minutes later. As Mrs. Allen left, Mr. Austin noticed that she looked like she had been beaten. Her check was red, as though she had been punched. The morning after the murder, Appellant approached Mr. Austin in the motel manager's office to ask for a loan. After Mr. Austin finished attending to another customer, Appellant told him not to let the maid clean the room because he had already cleaned it.

The police returned to further interview Appellant on March 8, 2006. Detectives Terrazas and Garcia picked Appellant up at the Deluxe Inn and transported him to a sheriff's department substation where Appellant made a voluntary statement. After Appellant signed the statement,

he was placed under arrest for his wife's murder. In the statement, Appellant admitted that he and his wife were homeless, and lived off what money she made as a prostitute and what money he could make cleaning trucks and selling small amounts of drugs. He admitted his wife had friends, other prostitutes, who where known in the area as "Polla" and "Shady Lady." He and Mrs. Allen lived in a trailer for some time with a man known as "Junior" and who Appellant referred to as "Willard." Appellant recalled the details of their work situation:

> I couldn't take living in the desert for very long. I needed a roof over my head, a bed, a television and somewhere to bathe.

> At first I was cool with Teresa prostituting because we made money and it was free sex. I was polishing, selling drugs and flying a sign but after I fell in love with Teresa, I wasn't so cool on her working.

> I told the officers that the black ledger that they picked up from my room contained the names of her Johns. She had some regular customers that would come in and she would have sex with.

> The way we worked was I would escort her to the trucks behind the truck stops predominantly behind the McDonald's on Horizon Boulevard. I would walk behind the truck while she walked the front line hitting up the drivers for sex.

> She would approach them from the driver's side. If she hooked a driver, I would write down the license place number and waited for her to finish. I would not allow her to leave with any of the drivers.

> One time she drove off on me and we got in a big fight and I had to hit her because I got pissed off. She told me that they had gone to an ATM machine for money but didn't realize how much she had endangered herself by doing that.

> Sometimes Teresa would give me the drivers name and handle, CB radio handle which I would write down and then later throw away. We would write down the names and numbers of the customers that were regular, however, that she could call.

> A friend of mine . . . would work the CB and help her get customers.

.     .     .

-7-

Sometimes Teresa would leave the door to the trucks open for safety while I would watch her back. I always made sure the money was given to Teresa up front and that she used condoms for safety.

Appellant went on to explain what he knew about his wife's relationship with "Qualified" (Ms. Bommarito). The day after his wife's death, Appellant went to "Cadillacs" to meet with friends. According to Appellant, while he was there, Ms. Bommarito approached the group, and when someone asked her if she knew about Mrs. Allen's death, Ms. Bommarito replied, "I sure did. The bitch had it coming. I don't give a fuck, the bitch had it coming for snitching me out." Five minutes later, Ms. Bommarito returned and apologized to Appellant.

Appellant admitted that both he and his wife abused drugs. He said his wife would "shoot up" with cocaine several times a day, and would start the day by buying a $20 bag of the drug. Once it got dark, they would go to the McDonald's parking lot to find "tricks" so Mrs. Allen could make money. She usually worked for four to five hours, while Appellant waited nearby.

Appellant also told police that he had been arrested for domestic violence and aggravated assault in the past. He explained, "I was arrested for hitting Teresa but only because I had no choice. Teresa would do some stupid stuff like taking off on me or not knowing where she was at." Appellant also admitted to physically abusing his wife on other occasions.

I was asked if I ever hit her when I told [the police] that I had. I would hit her with an open hand on her mouth and punch her with my fist on the arms when we fought.

I also remember hitting her one time with a broomstick when we were in Dallas on her right shin bone because she had left with some john for three days.

I was tired of her lying to me, spending money on drugs and spending money on the drivers. We often split up but always got back together.

-8-

I was also my wife's punching bag. She could punch like a man. We finally learned to sit down and talk I learned to agree, how to disagree without violence.

When asked whether Appellant and his wife fought the night she died, Appellant told the police they had not, that they had not had a fight in two weeks. He told police that the morning before she died, his wife woke him up at 5:30 p.m. to tell him she was going to work. He told police that he fell asleep after she left and did not wake up until they knocked on his door. According to the statement, Appellant and his wife had just finished a two or three-day drug binge when his wife left the motel room.

The jury found Appellant guilty, and the court sentenced him to thirty-eight years' imprisonment. On appeal, Appellant raises six issues. Issues One through Four are presented as follows: (1) "[t]he trial court erred in failing to redact all the extraneous offense mentioned in Appellant's confession thereby prejudicing Appellant and denying him the right to a fair trial;" (2) "[t]he trial court erred by denying Appellant an extraneous offense limiting instruction at the time Appellant's second statement was admitted into evidence;" (3) "[t]he trial court erred by denying Appellant an immediate extraneous offense limiting instruction to the jury each time it was requested;" and (4) "[t]he trial court erred by denying Appellant an extraneous offense limiting instruction in the jury charge." Issues Five and Six challenge the legal and factual sufficiency of the evidence supporting the conviction.

As a preliminary matter, we must address the State's argument that Appellant waived Issues One through Four because Appellant presented them under a single heading, and failed to delineate between the issues in his discussion and argument. The State argues that Appellant's briefing created a multifarious point of error, in violation of the Rules of Appellate Procedure,

and has thus waived the issues.

Appellant's brief purports to include six issues. However, having summarily concluded that Issues One through Four "are all related," Appellant's brief fails to further delineate between the specific issues raised. Appellant discusses his complaints regarding extraneous offense evidence and the trial court's limiting instructions without any reference to the "issues" he presents for review. The discussion of Issues One through Four consists of sixteen pages of argument without a single reference to the issue being addressed. Instead, the brief seems to refer to the issues only by reference to their subject matter, and leaves this Court to guess where one issue ends and another begins. In addition, other than conclusory statements, such as "[the trial court] abused [its] discretion . . .," "[the trial court's] instruction . . . wasn't sufficient to cure the damage done to the Appellant," and "Appellant's conviction should be set aside and a new trial ordered," the brief does not state how Appellant would have this Court dispose of each issue and thereby grant the relief he requests.

By melding multiple issues together as this brief does, an appellant risks rejection of his arguments on the basis that nothing has been presented for review. *See Cuevas v. State*, 742 S.W.2d 331, 335 n.4 (Tex.Crim.App. 1987)(discussing the dangers of a multifarious point of error), *overruled on other grounds Hughes v. State*, 878 S.W.2d 142, 147 n.6 (Tex.Crim.App. 1992). However, in the interests of justice, to the extent the arguments are sufficiently developed in the brief, we will exercise our discretion to address them. *See Foster v. State*, 101 S.W.3d 490, 499 (Tex.App.--Houston [1st Dist.] 2002, no pet.); *Rodarte v. State*, No. 08-04-00176-CR, 2006 WL 2201558, *5 (Tex.App.--El Paso 2006, no pet.)(no designated for publication).

In Issues One, Two, and Three, Appellant challenges the admission of State's Exhibit

Sixty-One, a redacted copy of his March 8, 2006 statement, and the adequacy of the trial court's limiting instructions accompanying the statement's admission. State's Exhibit Sixty-One contains a detailed account of Appellant's relationship with his wife. Appellant recounted the couple's history, their marriage, their mutual drug abuse, his wife's prostitution, and admitted that their relationship was often physically abusive. Appellant stated that he hit his wife, "only because [he] had no choice." He also admitted that when he assaulted his wife, "I would hit her with an open hand on her mouth and punch her with my fist on the arms when we fought. I also remember hitting her one time with a broomstick . . . on her right shin bone because she had left with some John for three days." However, regarding the state of their relationship immediately before her death, Appellant stated that he and his wife had not fought the night she died, and that they had not fought in the previous two weeks.

The State offered Exhibit Sixty-One under Article 38.36 of the Texas Code of Criminal Procedure.[1] Defense counsel objected to the statement's admissibility under Texas Rules of Evidence 404(b) and 403, and argued that despite its relevance pursuant to Article 38.36(a), it was inadmissible character conformity evidence and its probative value was substantially outweighed by the potential for prejudice. Having redacted all references to extraneous offenses other than Appellant's admissions of domestic violence, the State argued the statement was

---

[1] Article 38.36(a) states:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

TEX.CODE CRIM.PROC.ANN. art. 38.36(a)(Vernon 2005).

admissible to demonstrate the dynamics between Appellant and the deceased, including the history of domestic violence, drug use, and prostitution, pursuant to Article 38.36(a). Defense counsel responded by arguing that Appellant's admissions to domestic violence should also be redacted under Rule 403. After conducting a Rule 403 balancing test off the record, the trial court overruled Appellant's objections and admitted the statement into evidence without redacting it further.

Defense counsel then requested the jury be instructed as to the statement's limited purpose. Counsel asked that the jury be instructed, both orally and in the jury charge, to consider the statement only as evidence of the relationship between Appellant and the deceased, and not as evidence that he was acting in conformity with prior behavior. The State made no objection to the request, and the trial court provided the following instruction orally without objection from either side:

> [State's Exhibit Sixty-One] Will be admitted in evidence with all the prior discussion and objections that we have heretofore had in pretrial matters and with the understanding that this is not in regard to [Appellant's] character and I will give further instructions written instructions later on.
>
> I am sorry. Okay. Do you want me to repeat it again? Not in regard to character.

The State published the statement to the jury by reading it into the record. During the charge conference, defense counsel objected to the Court's proposed charge on the basis that it did not include an instruction limiting the jury's consideration of extraneous offense evidence, and requested an instruction limiting the jury's consideration of extraneous offenses to those it determined were committed by Appellant, "beyond a reasonable doubt."

Although the court denied defense counsel's request, the charge included the following

instruction without objection:

> You are instructed that you may consider all relevant facts and circumstances surrounding the killing, if any, and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the alleged offense, if any.

Issue One asks this Court to determine whether or not the trial court abused its discretion, "in failing to redact all the extraneous offense mentioned in Appellant's confession . . .." Appellant concludes that by failing to redact all references to domestic violence from the statement, he was unlawfully prejudiced and denied his right to a fair trial. The State responds by arguing that the statement was admissible pursuant to Article 38.36(a) as evidence of the relationship between Appellant and the deceased, and was necessary to rebut Appellant's defensive theory that the victim was murdered by one of her "Johns," or by another local homeless person.

We review a trial court's ruling to admit extraneous offense evidence for an abuse of discretion. *Rankin v. State*, 974 S.W.2d 707, 718 (Tex.Crim.App. 1996)(op. on reh'g). A trial court acts within is discretion so long as its decision to admit the evidence is is within the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391-92 (Tex.Crim.App. 1990)(op. on reh'g). State's Exhibit Sixty-One was offered and admitted pursuant to Texas Code of Criminal Procedure article 38.36(a). Article 38.36(a) allows the admission of all relevant evidence of the previous relationship between the accused and the murder victim. TEX.CODE CRIM.PROC.ANN. art. 38.36(a)(Vernon 2005); *Garcia v. State*, 201 S.W.3d 695, 704-05 (Tex.Crim.App. 2006). However, evidence which is otherwise admissible under Article 35.36(a), is still subject to the limitations provided by the Texas Rules of Evidence. *See Garcia*,

201 S.W.3d at 702-05.

Texas Rule of Evidence 404(b) prohibits admission of extraneous offenses to prove a person's character or to show that the person acted in conformity with that character. *See* TEX.R.EVID. 404(b). Extraneous offenses may be admissible, however, to establish motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See* TEX.R.EVID. 404(b); *Montgomery*, 810 S.W.2d at 378-88. Extraneous offense evidence may also be admissible to rebut a defensive theory. *Yohey v. State*, 801 S.W.2d 232, 236 (Tex.App.--San Antonio 1990, pet. ref'd). Whether objected-to evidence of other crimes, wrongs, or acts has relevance apart from character conformity is a question for the trial court. *Montgomery*, 810 S.W.2d at 391; *Castillo v. State*, 910 S.W.2d 124, 127 (Tex.App.--El Paso 1995, pet. ref'd). The trial court must conclude that the evidence tends to serve some purpose other than character conformity to make the existence of a fact of consequence more or less probable than it would be without the evidence. *Castillo*, 910 SW.2d at 127. A reviewing court should not reverse the trial court's ruling unless it lies outside the zone of reasonable disagreement. *Id*.

The indictment alleged, in relevant part, that Appellant "did . . . intentionally and knowingly cause the death of an individual, namely TERESA MCCOWAN ALLEN by striking TERESA MCCOWAN ALLEN about the head with an unknown object . . .." Appellant's defensive theory during trial was that he was not the killer, but that his wife was murdered by one of her "Johns," or by another homeless person living in the same community, and that the police failed to do a thorough investigation because the victim and the primary suspect were homeless. Appellant's defense centered on the issue of identity. The State was entitled to present evidence to rebut Appellant's theory by demonstrating that Appellant had a history of ongoing violent

-14-

conduct toward his wife, making the material fact that it was Appellant who committed the murder more probable. *See Castillo*, 910 SW.2d at 127. In addition, because of the lack of physical evidence, or witness accounts of the murder, the evidence of Appellant's violent relationship with the victim had significant probative value in establishing the identity of the perpetrator. Accordingly, Exhibit Sixty-One was not offered solely for the purpose of establishing a violent character, and we conclude that the trial court did not abuse its discretion by admitting the evidence over Appellant's Rule 404(b) objection.

Still, despite a preliminary conclusion that the evidence was relevant to prove a material fact independent of its tendency to show character conformity, when the trial court is also presented with a Rule 403 objection, the admissibility analysis must continue to determine if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *See Rogers v. State*, 991 S.W.2d 263, 266 (Tex.Crim.App. 1999). To make the Rule 403 determination, the trial court should consider: (1) how probative the extraneous offense evidence is; (2) the potential for the extraneous offense evidence to impress the jury in some irrational, but indelible way; (3) the amount of time the proponent will need to develop the evidence; and (4) the proponent's need for the evidence to prove a fact of consequence. *Wyatt v. State*, 23 S.W.3d 18, 26 (Tex.Crim.App. 2000). Only a significant disparity between the degree of prejudice and the probative value of the evidence will be sufficient to require exclusion. *See Jones v. State*, 944 S.W.2d 642, 652 (Tex.Crim.App. 1996).

The evidence of the nature of Appellant's relationship with his wife, including the history of domestic violence, prostitution, and drug use, was probative of the circumstances surrounding Teresa's death, and was relevant to rebut Appellant's defensive theory. *See Garcia*,

-15-

201 S.W.3d at 704. Appellant summarily concludes that the probative value of his confession to prior instances of domestic violence was substantially outweighed by the danger of unfair prejudice. Appellant has failed to demonstrate, however, that a "significant disparity" exists between the degree of potential prejudice presented by the admissions, as compared to the probative value of the evidence to establish the nature of his relationship with his wife, and to rebut his defense. *See Jones*, 944 S.W.2d at 652; *see also Garcia*, 201 S.W.3d at 704 (noting that the proper measure for "substantially outweighed" versus "unfair prejudice" asks whether the jury convicted the defendant based on the prior bad act evidence despite having a reasonable doubt as to the defendant's guilt for the charged offense). In sum, the evidence of domestic abuse contained in Exhibit Sixty-One did not run afoul of the limitations imposed by Rule 404(b) and Rule 403. The trial court's decision to admit the evidence pursuant to Article 38.36(a) did not constitute an abuse of discretion.

In his appellate brief, Appellant's discussion of Issues One through Four also includes approximately ten pages of argument regarding the trial court's decision to permit several witnesses to testify about the abusive nature of Appellant's relationship with his wife. In light of our preliminary discussion about the problems inherent in the multifarious type of organization presented by Appellant's brief, and because Appellant's statement of Issue One refers specifically to the admissibility of State's Exhibit Sixty-One, we have limited our discussion to that piece of evidence. To the extent, Appellant has attempted to raise additional issues or arguments within Issue One regarding the admissibility of witness testimony, those arguments have not been properly presented for our review and are waived. *See* TEX.R.APP.P. 38.1(f),(I); *Rodarte*, 2006 WL 2201558 at *5. Issue One is overruled.

In Issues Two and Three, Appellant challenges the trial court's denial of defense counsel's request for extraneous offense limiting instructions following Exhibit Sixty-One's admission, and during several witnesses' testimony regarding Appellant's relationship with his wife. As with Issue One, the brief fails to delineate these two issues from the balance of Issues One and Four. Again, in the interests of justice, we will address them to the best of our ability. *See Foster*, 101 S.W.3d at 499.

As to Appellant's "Issue Two" argument, we do not agree that the trial court refused to instruct the jury following the admission of Exhibit Sixty-One. As the above excerpts from the record demonstrate, the court instructed the jury not to consider Appellant's statement in regard to character when the exhibit was admitted into evidence. Also, as noted above, there was no objection to the court's instruction. As the trial court did not deny Appellant's request for a limiting instruction regarding Exhibit Sixty-One, and because any argument regarding the instruction's sufficiency was not preserved for review, Issue Two is overruled. *See* TEX.R.APP.P. 33.1(a).

In Issue Three, Appellant purports to challenge the trial court's refusal to provide a limiting instruction "each time it was requested." In as much as we have been able to identify it, the briefing dedicated to this is limited to approximately one page of discussion. Appellant admits that the trial court did provide a limiting instruction in response to defense counsel's request during one witness's testimony, and further admits that counsel did not object to the instruction given. Still, Appellant argues that the instruction itself was inadequate, and concludes that "[defense counsel] probably figured that considering the inadequate instructions already given by [the trial court], it was hardly worth asking for more instructions." The discussion ends

-17-

with a statement that the instruction was not sufficient, and that "Appellant's convictions should be set aside and a new trial ordered." The discussion does not contain a single legal citation. Again, to the extent Appellant argues the trial court's instructions were insufficient, the argument has not been preserved for our review. *See* TEX.R.APP.P. 33.1(a). With regard to Appellant's argument that he is entitled to a new trial due to the court's refusal to instruct the jury during testimony, the issue has not been adequately briefed and is waived. *See* TEX.R.APP.P. 38.1(i); *Foster*, 101 S.W.3d at 499. Issue Three is overruled.

In Issue Four, Appellant contends the trial court erred by denying his request for a "beyond a reasonable doubt" extraneous offense instruction to be included in the jury charge. When considering a charge error complaint, the reviewing court must first determine whether the charge was erroneous, and then determine whether sufficient harm resulted from that error to require reversal. *Mann v. State*, 964 S.W.2d 639, 641 (Tex.Crim.App. 1998). When the alleged error was properly preserved for review, the "some harm" standard will lead to reversal unless the error was harmless. *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex.Crim.App. 1994).

Appellant argues the trial court's refusal to include the requested extraneous offense instruction constituted "reversible error" because once an extraneous offense instruction has been requested, "[the defendant] is entitled to it." The remainder of Appellant's argument on this issue states:

> To deny the Appellant such an instruction could never be harmless especially considering that the inadequate immediate limiting instructions given by [the trial judge] weren't sufficient to cure the damage done to the Appellant by admission of the extraneous offense testimony. Therefore, Appellant's conviction should be set aside and a new trial ordered.

In light of defense counsel's objection and request, the trial court should have included a

reasonable doubt instruction in the charge in addition to the Article 38.36(a) instruction. *See*

*George v. State*, 890 S.W.2d 73, 75 (Tex.Crim.App. 1994). We must now consider whether

Appellant suffered "some harm" as a result of this error. *See Abdnor*, 871 S.W.2d at 731-32.

The extraneous offense evidence at issue was contained in Appellant's voluntary

statement; State's Exhibit Sixty-One.[2] As we discussed in Issue One, and as reflected in the

charge, the statement was admitted for the specific purpose of establishing the nature of

Appellant's relationship with his wife prior to her death. *See* TEX.CODE CRIM.PROC.ANN. art.

38.36(a).

As we discussed in our analysis of the document's admissibility, the statement contained

Appellant's categorical confession to physically abusing his wife on numerous occasions prior to

her murder. The confession also included a detailed account of the manner of the assaults, and

Appellant's statement that he "had no choice" but to perpetrate the abuse. Appellant argues there

is no basis to conclude that he was not harmed by the trial court's failure to instruct the jury that

it should only consider the prior-abuse extraneous offense evidence after they determined,

"beyond a reasonable doubt" that Appellant committed the offenses. Although we do not do so

lightly, under the unique circumstances presented in this case, we disagree with Appellant's

argument.

The contents of Appellant's statement were completely uncontested and uncontradicted at

trial. Although Appellant denied that he assaulted his wife on the day she died, there was no

---

[2] Again, our discussion is limited to Appellant's argument associated with the State's use of his voluntary statement. To the extent, Issue Four includes arguments regarding extraneous offense evidence contained in witness testimony; those arguments are overruled due to waiver. TEX.R.APP.P. 38.1(f),(i); *Rodarte*, 2006 WL 2201558 at *5.

factual dispute that Appellant was the individual who committed the prior instances of domestic violence referred to in his statement. Absent some dispute or challenge to the evidence, the question of Appellant's commission of the offenses was taken out of the jury's hands, and Appellant was not harmed by the lack of a jury determination that he committed the offenses beyond a reasonable doubt. Because the court's error in refusing to further instruct the jury on the standard of proof relating to extraneous offense evidence was harmless, we overrule Issue Four.

In Issues Five and Six, Appellant challenges the legal and factual sufficiency of the evidence supporting his conviction. In a legal sufficiency review, we must consider all of the evidence in a light most favorable to the verdict, and determine whether a reasonable minded juror could have found the essential elements of the charged crime were proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). We must defer to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper*, 214 S.W.3d at 13.

We begin a factual sufficiency review by considering all the evidence in a neutral light. *Grotti v. State*, 273 S.W.3d 273, 283 (Tex.Crim.App. 2008), *citing Roberts v. State*, 220 S.W.3d 521, 524 (Tex.Crim.App. 2007). The court must ask whether the jury was rationally justified in finding the defendant guilty beyond a reasonable doubt. *Watson v. State*, 204 S.W.3d 404, 415 (Tex.Crim.App. 2006). There are two ways the evidence can be deemed factually insufficient: (1) when the evidence supporting the verdict is so weak that the jury's verdict seems clearly

wrong and manifestly unjust; and (2) when considering the jury's verdict, the evidence, although legally sufficient, is nonetheless against the great weight and preponderance of the evidence. *Id.* at 414-15. A reversal for factual insufficiency cannot occur when, "the greater weight and preponderance of the evidence actually favors conviction." *Roberts*, 220 S.W.3d at 524, *quoting Watson*, 204 S.W.3d at 417.

Appellant was convicted of murder as alleged in the indictment. In relevant part, the indictment alleged that Appellant:

> [I]ntentionally and knowingly cause[d] the death of an individual, namely, TERESA MCCOWAN ALLEN by striking TERESA MCCOWAN ALLEN about the head with an unknown object,

> And it is further presented that [Appellant] used and exhibited a deadly weapon . . . during the commission of and immediate flight from said offense . . ..

*See* TEX.PEN.CODE ANN. § 19.02 (b)(1)(Vernon 2003).

After reciting the relevant standards of review and citing the pertinent sections in the Penal Code, Appellant commits six and a half pages in the brief to identifying gaps in the circumstantial evidence presented during the guilt/innocence phase. From these pages, we have identified three distinct arguments: (1) that the purely circumstantial nature of the State's case cannot support the conviction; (2) that the conflicts and inconsistencies in the evidence renders the evidence legally and factually insufficient; and (3) that the jury convicted Appellant for having a bad character based on the extraneous offense evidence. As to Appellant's first argument, it is well accepted that "the cumulative force of all the surrounding additional facts and incriminating circumstances may be sufficient to support the jury's conclusion of guilt." *Torres v. State*, 141 S.W.3d 645, 660 (Tex.App.--El Paso 2004, pet. ref'd). Regardless of the

type of evidence relied upon by the State, the question in a sufficiency review remains whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Barnes v. State*, 876 S.W.2d 316, 321 (Tex.Crim.App. 1994). The fact that the State's case against Appellant consisted entirely of circumstantial evidence does not automatically render the evidence legally or factually insufficient. *See Torres*, 141 S.W.3d at 660.

Appellant's second argument is essentially an attack on the jury's resolutions of conflicts and inconsistencies in the evidence. As is reflected in the standard of review for evidentiary sufficiency, this Court must show almost total deference to the jury's determinations of the weight and credibility attributed to witness testimony, as well as its resolutions of conflicts in the evidence. *See Torres*, 141 S.W.3d at 659 (noting the duty of the appellate court is limited to determining whether the implicit and explicit findings of the trier of fact are rational in light of the record as a whole). To sustain Appellant's legal and factual sufficiency arguments, we would be forced to violate our duty to defer to the jury's resolutions of conflicts in the evidence, as well as its determinations of weight and credibility. We decline to do so.

Appellant makes no alternative challenge to the evidence supporting a particular essential element of the offense, but simply concludes, "[a] lot of extraneous offense evidence was admitted, and the jury may have found Appellant guilty because he was a bad character. The rest of the State's evidence was not legally or factually sufficient to convict him of the offense of Murder." In light of our discussion of Issues One through Four, Appellant's sufficiency argument related to extraneous offense evidence must also fail.

In light of the evidence as recited in the opening paragraphs of this opinion, we conclude

whether viewed in the light most favorable to the verdict, or in a neutral light, the evidence was sufficient to support the jury's verdict. Issues Five and Six are overruled.

Having overruled all of the issues Appellant has presented for our review, we affirm the judgment of conviction.

June 30, 2010

DAVID WELLINGTON CHEW, Chief Justice

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)