

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-25-00001-CR

LATOYA SKORICH, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

No. 07-25-00002-CR

JOHN WOODY, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 222nd District Court
Deaf Smith County, Texas
Trial Court No. CR-2021B-020, CR-2021B-021 Honorable Roland D. Saul, Presiding

March 30, 2026

OPINION

Before PARKER, C.J., and DOSS and YARBROUGH, JJ.

On the evening of September 10, 2020, a seven-year-old boy arrived at a Hereford, Texas, emergency room unresponsive, severely dehydrated, and covered in bruises. His

sodium levels were the highest the treating physicians had ever seen. Medical professionals did not expect him to survive. His mother, Appellant Latoya Jo Skorich, and her boyfriend, Appellant John Woody, had been traveling with him for days in an 18-wheeler immediately before his admission. Both were later charged with injury to a child causing serious bodily injury and injury to a child causing bodily injury.[1]

Woody and Skorich were separately indicted but agreed to be tried together. A jury found both guilty and assessed punishment. Woody received concurrent sentences of 30 years and 10 years imprisonment with a $10,000 fine. Skorich received concurrent sentences of 20 years and 10 years imprisonment with a $10,000 fine. We consolidate these appeals because the facts and legal issues substantially overlap.

Both Appellants challenge the trial court's subject matter jurisdiction and venue. Woody separately contends he owed no legal duty to the child. Skorich separately challenges the legal sufficiency of the evidence supporting her convictions. We hold the trial court had jurisdiction and venue was proper. We further hold sufficient evidence supported a finding that Woody assumed a duty of care, custody, and control, and that Skorich knowingly or recklessly caused the child's injuries through her omissions. We affirm the judgments and sentences for both Appellants.

---

[1] *See* TEX. PENAL CODE § 22.04.

BACKGROUND

## A.  The Family Unit

Woody and Skorich lived together in Arkansas.  Skorich considered Woody her husband and the stepfather to her seven-year-old son, "A.T."[2]  Woody made his living as a long-haul truck driver.  Skorich often stayed home with A.T. and helped schedule hauls.  A.T. and Skorich lived either in Woody's house or with him in the truck.  Woody and Skorich combined Woody's income with A.T.'s disability checks to pay for the family's needs.

During the COVID pandemic, A.T. was enrolled in an online school; this permitted him and Skorich to spend more time on the road with Woody.  For the haul that led to these charges, Skorich booked a route from Arkansas to California and back.  A substantial part of that road trip passed through Texas.

## B.  The Road Trip

Although he was age seven, A.T. had developmental delays and was being potty trained.  He used a portable urinal during the day, so the family did not have to stop driving.  During the road trip, Appellants restricted A.T.'s fluid intake to no more than eight ounces every one to one-and-a-half hours until 2:00 p.m., after which he was not allowed any fluids at all.

There was no seat or seatbelt for A.T. in the cab of the 18-wheeler.  The only place for him to sit or sleep was a bunk bed that sat six feet from the floor.  At times, A.T. sat or

---

[2] We use initials to mask the identity of the minor victim.

slept on the floor between the driver and passenger seats. Appellants told law enforcement that during the trip, A.T. fell off his bunk bed at least once, though their accounts of when this occurred conflict.[3]

Also conflicting are the Appellants' reports of an "outburst" A.T. had while the family was returning from California.[4] According to Appellants, the boy began hitting and kicking Woody while Woody was driving. Unable to calm A.T., Woody pulled over. Skorich went into the cab to get something to eat. Woody then allegedly punished A.T. with a belt.

On September 9, 2020, Appellants and the boy reached the Midland-Odessa area from New Mexico by way of El Paso. A.T. had become lethargic. According to Woody, A.T. had begun showing signs of lethargy as early as September 7 or 8. Woody told officer Stewart he instructed Skorich on when to seek medical care, stating that if A.T. did not get better in a couple of days, they would take him to the hospital. Woody acknowledged that A.T.'s condition "progressively keeps getting worse."

On September 10, the family was en route from Midland-Odessa to Hereford. When they stopped at a truck stop for the night, A.T. was discovered to be unresponsive. Appellants then took A.T. to the emergency room at Hereford's local hospital.

---

[3] According to Woody's interview with officer Tim Stewart, A.T. fell off the bunk bed more than once.

[4] Appellants maintained the outburst and punishment occurred near the Arizona-New Mexico border. Admitted cell phone data shows the family traveling from Arizona to New Mexico mid-afternoon on September 9, entering Texas that evening, and remaining there through A.T.'s hospital admission the following evening. But early on September 11, Skorich twice told Officer Stewart the incident occurred "yesterday," permitting a factfinder to conclude the outburst and punishment took place after the family entered Texas.

## C.  A.T.'s Medical Condition

Upon arrival at the Hereford emergency room, A.T. was in a borderline comatose state, exhibiting almost no response to verbal commands or physical stimuli aside from slight withdrawal from pain.  Dr. Caom Hansen observed that the child's eyes were rolled back in his head and that he was in severe circulatory distress, characterized by a rapid heart rate and a pulse that was weak and thready.  Clinical signs of profound dehydration were immediately apparent.  A.T.'s mouth was so dry that his saliva had turned into a paste and crust, and his skin exhibited tenting: it remained peaked when pinched rather than rebounding.  Because the boy's blood volume was so low, staff could not find a vein for a standard IV and were forced to drill a metal intraosseous device into a bone to pump fluids directly into the marrow.  The lack of moisture in A.T.'s mucous membranes also made emergency intubation difficult, as the breathing tube would not slide easily through his dry larynx.

Laboratory results confirmed a sodium level of nearly 200.  Dr. Raphael Mattamal, a pediatric hospitalist at Northwest Texas Hospital in Amarillo, testified at trial that A.T.'s lab values were "wildly out of the bounds of what you should have in your body" and that such a level "would kill most of the people in this room."  The jury heard medical evidence that due to A.T.'s chronic water deprivation, his body was forced to prioritize available blood for his brain at the sacrifice of other organs like kidneys.  This, in effect, resulted in A.T. to suffer from uremic encephalopathy caused by toxins building up in his blood.  Dr. Hansen testified that the level of dehydration A.T. had achieved is not possible for someone to achieve on their own, meaning the human body responds to prevent this from happening.  Dr. Mattamal categorized the dehydration as chronic, not likely caused by a

5

virus: water was likely withheld from A.T. over an extended period until sodium levels became "astronomically abnormal."

In Hereford, physicians knew A.T. needed more extensive care than their hospital could provide. They stabilized him for transport to a children's hospital in Amarillo. When A.T. arrived, his sodium levels remained at record highs, even for the children's hospital. A.T. was admitted to the intensive care unit.

## D. A.T.'s Physical Injuries

Beyond the internal medical crisis, A.T. was covered in injuries from head to toe. Dr. Hansen observed substantial, layered bruising on A.T.'s buttocks and thighs. He defined layering as the presence of bruises in multiple stages of healing in a single area, ranging from older yellow-brown bruises to fresh, bright red petechiae. He further observed weeping wounds, indicating trauma that had just occurred. Both Dr. Hansen and the examining nurse concluded that these patterned injuries were inflicted trauma rather than the result of accidental falls.

Forensic Nurse Felicia Manning conducted a detailed head-to-toe examination of A.T. at the Amarillo hospital, documenting over 30 distinct sites of injury using body diagrams. These injuries were widespread across the child's body, including multiple bruises on his forehead, under his chin, on the left side of his abdomen, and on both sides of his chest. Manning also identified significant trauma to A.T.'s extremities and back, noting bruises on his upper and lower arms, knees, and lower legs, as well as circumferential gray-blue bruising surrounding his rectum. She noted the injuries were

consistent with the use of an object like a belt or buckle.[5] Officer Erik Medel's initial photographs at the Hereford emergency room provide further evidence of the trauma, capturing numerous pink, purple, and red bruises that witnesses testified appeared fresh. Medical professionals were most concerned about dark bruising on A.T.'s buttocks that resembled the shape of a large hand.

## E. Appellants' Explanations

When confronted with these injuries, Appellants offered varying explanations. Woody appeared to agree with the investigating officer that the boy had extensive bruising; Skorich denied seeing any. Each also theorized possible causes: natural susceptibility, A.T.'s clumsiness, running when he should have walked, falls from the bunk bed, Ehlers-Danlos syndrome, anemia, pharmaceuticals, tantrums, or self-inflicted injury to punish them.

The jury also heard evidence of another cause: punishment. When A.T. wasted food or medicine or destroyed things, he was punished. Woody handled most discipline when A.T. failed to respond to a "time-out," using a belt, often on A.T.'s bare buttocks. Skorich reported that A.T. "can't feel" ordinary spankings, requiring spankings of sufficient quantity or severity to "get his attention." She then explained that spankings continued only until A.T. said he felt a sting. Woody acknowledged his belt sometimes left bruising in its shape. He admitted hitting A.T. harder than he should have on a few past occasions

---

[5] Multiple witnesses also documented head trauma. Officer Medel described a giant welt on the back of A.T.'s head. Dr. Hansen confirmed swelling there, and the investigating officer photographed a scabbed injury in the same location the next day. Woody called the injury an accident; Skorich attributed it to A.T. falling from the top bunk in the semi-truck. Medical experts found both explanations inconsistent with the severity and nature of the injuries.

but denied doing so within the last two or three days. He said he had assumed the role of primary disciplinarian because A.T.'s paternal grandmother and aunt had been too deferential, leaving A.T. "not afraid of them."

The State removed A.T. from Appellants' care, and he was placed with the Texas Department of Family and Protective Services. Thereafter, Appellants left Texas and continued working as long-haul truckers together. After a grand jury indicted them and an arrest warrant was issued, Appellants were arrested in Nebraska and extradited by the Deaf Smith County Sheriff's Department to Hereford. Skorich later permanently surrendered her parental rights to A.T.

## ANALYSIS

By numerous issues, Skorich and Woody both contend the trial court erred in denying their motions for instructed verdict. They argue the court lacked jurisdiction and that venue was improper. Woody also argues his motion should have been granted because he owed no duty to A.T. Skorich argues the evidence was legally insufficient to support her convictions. We address each issue, beginning with Appellants' challenges to the court's jurisdictional authority.

## A. Territorial Jurisdiction

Both Appellants challenge the trial court's territorial jurisdiction. Under Texas Penal Code § 1.04, a Texas court has jurisdiction over an offense when "either the conduct or a result that is an element of the offense occurs inside this state." TEX. PENAL

CODE § 1.04(a)(1).[6] The statute reaches conduct that begins in Texas and produces results elsewhere,[7] as well as conduct that begins elsewhere but produces results in Texas.[8] *See Lee v. State*, 537 S.W.3d 924, 926 (Tex. Crim. App. 2017) ("Texas has jurisdiction over an offense if either a conduct element or a result element occurs inside the state.").

Injury to a child is a result-oriented offense. *Cyr v. State*, 665 S.W.3d 551, 556 (Tex. Crim. App. 2022). Section 22.04(a) defines the offense as occurring when a person, by act or omission, causes a child bodily injury. TEX. PENAL CODE § 22.04(a). The consequence of a defendant's conduct (i.e., the injury) is therefore an element of the offense. *Id.*

We need not determine precisely when Appellants' conduct or omissions satisfied the elements of § 22.04. The evidence permits a rational factfinder to find that A.T.'s condition deteriorated while in Texas. *See* TEX. PENAL CODE § 1.04(a)(1) (reaching "either the conduct or a result" occurring in Texas). After Appellants entered the state, A.T. became lethargic somewhere during the drive from El Paso to Midland-Odessa. As they

---

[6] Additionally, § 1.04(c) provides that when an offense is based on an actor's omission to perform a duty imposed by statute, such act (c) "is committed inside this state regardless of the location of the actor at the time of the offense." TEX. PENAL CODE § 1.04(c).

[7] *See Rodriguez v. State*, 146 S.W.3d 674, 677 (Tex. Crim. App. 2004) (kidnapping in Texas followed by murder in Mexico); *Brown v. State*, No. 02-22-00037-CR, No. 02-22-00038-CR, 2023 Tex. App. LEXIS 7088, at *23 (Tex. App.—Fort Worth Sept. 7, 2023, no pet.) (vehicle driven on Texas service road became airborne and landed on Oklahoma side of Red River).

[8] *Delaney v. State*, No. 09-25-00039-CR, 2025 Tex. App. LEXIS 9631, at *20–21 (Tex. App.—Beaumont Dec. 17, 2025, pet. filed) (Missouri resident transmitted child pornography to investigator in Texas); *see also Roberts v. State*, 619 S.W.2d 161, 164 (Tex. Crim. App. 1981) (quoting 22 C.J.S. Criminal Law § 134 for the proposition that when an offense encompasses consequences affecting persons or property within a jurisdiction, the crime is generally regarded as having been committed where the consequences occur, regardless of where the act took place); *Strassheim v. Daily*, 221 U.S. 280, 285 (1911) (holding that acts performed outside a jurisdiction, but with intended results within it, justify that jurisdiction in punishing the cause of the harm as if defendant had been present).

drove toward Hereford, he lost consciousness. When they stopped in Hereford, he was unresponsive.

Dr. Mattamal testified that before A.T. became unresponsive, he would have exhibited observable symptoms, such as less activity, glazed eyes, and not talking. Appellants noticed some change in A.T.'s condition. Skorich told the investigating officer that in the past three days, A.T. had been acting differently. Woody likewise described things going on for the past three or four days, and that the couple had discussed when A.T. should receive medical care; he told Officer Stewart that the boy was getting progressively worse. This deterioration, from lethargy to unconsciousness to unresponsiveness, permits the reasonable inference of a child whose condition was worsening mile by mile.

Evidence shows that A.T. was taken to the emergency room in Hereford and later transferred to Amarillo, where he continued to suffer the consequences of dehydration. El Paso, Midland, Odessa, Hereford, Amarillo, and the routes between them are all in Texas. The evidence permits the conclusion that Appellants' failure to provide adequate fluids and medical care allowed A.T.'s serious bodily injury to occur or worsen while he was in this state. Under § 1.04(a)(1), that is enough. Because Texas possessed territorial jurisdiction, the trial court properly exercised its authority to hear the case.

The second charged offenses alleged that, in Deaf Smith County, Woody knowingly or recklessly caused bodily injury to A.T. by striking him, and that Skorich knowingly or recklessly failed to protect A.T. from assault despite a legal duty to do so.

Much of the testimony pertained to an alleged outburst that led to Woody spanking A.T. with a belt. Skorich testified that Woody last spanked A.T. near the Arizona-New Mexico border. The jury was free to disregard this geographic estimation. *See Torres v. State*, 141 S.W.3d 645, 654 (Tex. App.—El Paso 2004, no pet.). It could have found her account self-serving and designed to defeat Texas jurisdiction. Moreover, upon A.T.'s admission into the Hereford hospital on September 10, Skorich told officers (early the morning of the 11th) that A.T.'s outburst and resulting spanking occurred "yesterday." The record reveals that Appellants and A.T. were in Texas some of the ninth and all of the tenth.

The Hereford emergency room physician also testified that A.T. had multiple injuries in different stages of healing. One injury was believed to be recent because there were petechiae and the wound was still weeping. The State introduced photographic exhibits depicting A.T.'s injuries at the time he arrived at the hospital.

The jury was entitled to believe the evidence the State presented regarding how and when A.T. suffered those bruises. *Chakravarthy v. State*, 516 S.W.3d 116, 127 (Tex. App.—Corpus Christi 2017, pet. denied). Based on the admitted evidence, the jury was free to conclude Woody's act of striking A.T. occurred in Texas. Because Skorich's failure to protect A.T. is tied to the location of Woody's conduct, we hold the evidence is also sufficient to establish territorial jurisdiction over both offenses for both Appellants.

We overrule Appellants' issues complaining of an absence of territorial jurisdiction.

## B. Venue

Next, both Appellants argue that venue was improper in Deaf Smith County. We disagree.

Venue is not an element of the offense and may be proven by a preponderance of the evidence. *Estrada v. State*, 148 S.W.3d 506, 508 (Tex. App.—El Paso 2004, no pet.); *see also* Tex. Code Crim. Proc. art. 13A.002(b). Texas venue statutes reflect a "substantial contacts" approach, meaning the defendant, the conduct, the victim, or the fruits of the crime must have some relationship to the prosecuting county. *Soliz v. State*, 97 S.W.3d 137, 141 (Tex. Crim. App. 2003).

Appellants' venue challenge rests on the claim that no evidence places A.T.'s injuries in Deaf Smith County. They point to Skorich's own testimony that the discipline occurred near the Arizona-New Mexico border. But conflicting evidence, discussed above, supports a finding that A.T.'s outburst and punishment occurred while the family was in Texas. Skorich's testimony and cell phone records also show Appellants were in Texas for almost 24 hours before taking A.T. to the hospital. And although Skorich testified she noticed no bruising on A.T., the medical testimony and Woody's own acknowledgment of extensive bruising undermine that claim.

Moreover, as explained above, injury to a child is a result-oriented offense. Sufficient evidence supports a finding that A.T.'s serious bodily injury occurred or worsened in Deaf Smith County. When Appellants stopped at a truck stop in Hereford,[9] they found A.T. unresponsive. They took him to the Hereford emergency room, where

---

[9] Hereford is the county seat of Deaf Smith County.

12

his sodium levels were so high the treating physicians did not expect him to survive. The result of Appellants' conduct manifested there.

Even setting aside this evidence, venue was alternatively proper under the extradition provision. *See* TEX. CODE CRIM PROC. art. 13.19[10] (providing that the location of an offense committed within the state cannot readily be determined, venue lies in the county to which the defendant is extradited). The jury's charge includes this provision. Appellants were arrested in Nebraska and extradited to Hereford. Therefore, under either theory, sufficient evidence established Deaf Smith County as the proper venue.

We overrule Appellants' issues complaining of improper venue.

## C. Sufficiency of the Evidence

When conducting a review of the evidence for sufficiency, we consider all the evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences, any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Reese v. State,* No. 07-19-00253-CR, 2020 Tex. App. LEXIS 3771, at *15 (Tex. App.—Amarillo May 4, 2020, pet. ref'd); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017)).[11] We defer to the jury's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Reese,* No. 07-19-00253-CR, 2020 Tex. App. LEXIS 3771, at *15. A conviction can be supported on circumstantial

---

[10] This article was repealed in 2023, but the substance is now found in TEX. CODE CRIM PROC. art. 13A.003.

[11] We review a trial court's ruling on a motion for directed verdict under the same standard as a review of legal sufficiency. *Reese*, No. 07-19-00253-CR, 2020 Tex. App. LEXIS 3771, at *14–15.

evidence; we do not require that any single item of evidence prove guilt on its own. *See id*.

1. Woody's Challenge: No Evidence of Duty Owed to A.T.

Woody argues that he could not be convicted of serious bodily injury to A.T. by omission because he did not have a duty of care to A.T. We disagree.

Texas Penal Code § 22.04(a) provides that a person commits an offense if the person intentionally, knowingly, recklessly, or with criminal negligence, by act or by omission, causes serious bodily injury or bodily injury to a child. TEX. PENAL CODE § 22.04(a). Subsection (b) clarifies the scope of the relationship to a child, elderly person, or disabled individual: that the defendant has "a legal or statutory duty to act" on their behalf, *or* "has assumed [their] care, custody, or control." § 22.04(b). A defendant has assumed care, custody, or control when they have, "by act, words, or course of conduct acted so as to cause a reasonable person to conclude that he has accepted responsibility for protection, food, shelter, and medical care for a child . . . ." § 22.04(d).

The statute was not always so expansive. Under an earlier version, Texas courts held there was no common law duty imposed on individuals to protect strangers from harm that could be engrafted on the Penal Code's provisions. In *Billingslea v. State*, 780 S.W.2d 271 (Tex. Crim. App. 1989) (en banc), for example, a son who lived with his wife and 94-year-old mother was charged with injury to an elderly individual after his mother was found in deplorable condition, suffering from severe bedsores, burns, and malnutrition. The Court of Criminal Appeals held the indictment was fundamentally defective because it failed to allege the son possessed a statutory duty to act. *Id*. at 276.

14

The court applied similar logic in *Florio v. State*, 784 S.W.2d 415 (Tex. Crim. App. 1990). There, a mother's live-in boyfriend was convicted of injury to a child by omission after the child died from neglect. The Court of Criminal Appeals reversed, holding that the record did not establish a statutory duty of care on the part of the defendant toward the child. *Id.* at 417. Although the court of appeals had described the defendant as "babysitter, disciplinarian and caretaker" – terms that might describe a moral duty – they fell short of establishing the parent-child relationship and corresponding statutory duties. *Id.* The defendant's status as a live-in boyfriend did not provide a basis for prosecution under the statute as it then existed. *Id.*

Importantly, the *Florio* court recognized that change lay ahead. In a footnote, the court observed that § 22.04, as amended effective September 1, 1989, would "provide[] statutory authority for potential prosecution of actors who have assumed responsibilities of care toward the specified classes of protected individuals." *Id.* at 417 n.2; *see* Act of May 29, 1989, 71st Leg., R.S., ch. 357 (S.B. 1154), § 1. The amended statute added what is now subsection (b), establishing the alternative bases for criminal liability discussed in the present case. TEX. PENAL CODE § 22.04(b).

*Rey v. State*, 280 S.W.3d 265 (Tex. Crim. App. 2009), shows how the amended statute operates. Rey was married to a woman who had a three-year-old son from a prior relationship. *Id.* at 266. During the marriage, the defendant and his wife had a daughter. *Id.* After the couple separated, the defendant arrived one night at his estranged wife's apartment and found both children alone. *Id.* He removed both children but then left his stepson outside on a cold night and took only his biological daughter with him. *Id.* at 267. Rey was convicted of child abandonment under § 22.041(b).

15

This Court, sitting *en banc*, reversed. Applying logic similar to *Florio* and *Billingslea*, the Court reasoned that the status of stepparent alone does not obligate the stepparent to care for a stepchild except in limited circumstances. *Rey v. State*, 238 S.W.3d 840, 842 (Tex. App.—Amarillo 2007, *rev'd,* 280 S.W.3d 265 (Tex. Crim. App. 2009)). The Court found the record bereft of evidence that Rey had accepted responsibility to protect, shelter, feed, and care for the three-year-old, and it rendered a judgment of acquittal.

The Court of Criminal Appeals disagreed. It held that the revised Penal Code provision did not contain an "in loco parentis" requirement, and that this Court erred in reading one in. *Rey*, 280 S.W.3d at 268. The test under the plain language of § 22.04 is whether a person had at least temporary care, custody, or control, not whether the person assumed all the duties of a parent. *Id*. The proper analysis asks, consistent with § 22.04(d), whether the defendant, by act, words, or course of conduct, acted so as to cause a reasonable person to conclude that he accepted responsibility for protection, food, shelter, and medical care for the child. *Id.*

In determining whether a defendant assumed care, custody, or control, courts examine the defendant's acts, words, and course of conduct. Relevant considerations include whether the defendant lived with the child, provided financial support, participated in decisions regarding the child's care or discipline, held himself out as a parental figure, and provided food, shelter, or transportation for the child. Circumstantial evidence alone may establish this element. *See Proo v. State*, 587 S.W.3d 789, 809–13 (Tex. App.—San Antonio 2019, pet. ref'd); *Bleimeyer v. State*, 616 S.W.3d 234, 242 (Tex. App.—Houston [1st Dist.] 2021, no pet.).

16

Woody's sufficiency argument relies in large part on the *Florio* line of cases. That reliance is misplaced. Given the amendment to § 22.04, we examine whether evidence would support the conclusion that Woody assumed care, custody, or control of A.T.

There is sufficient evidence of acts, words, and course of conduct demonstrating Woody's assumption of care, custody, and control over A.T. The record shows that Appellants and A.T. lived together as a family unit. Skorich and Woody considered themselves husband and wife, and A.T. was referred to as their "Son." A.T. called Woody "Daddy Johnny"; Woody referred to himself in the third person as A.T.'s "Daddy." Woody told the investigating officer that the boy looked up to him more than Skorich because he was the father figure. Woody said that he took care of A.T. during times when Skorich needed to go into a store so that the boy would not cause a scene.

Appellants shared the family's income and bills. Woody provided food and shelter for A.T., who lived either in Woody's house or with him in his truck. Photographs showed the truck was equipped with a port-a-potty, a refrigerator, a microwave, and cases of water, items Woody managed as the driver.

In addition, Woody undertook parental duties for A.T. He took the child to the bathroom and to shower. He participated in A.T.'s education, including reading and color instruction. He assumed the role of primary disciplinarian for A.T. Evidence sufficiently shows that Woody spanked A.T. with a belt. Evidence is replete regarding an occasion wherein Woody pulled the semi-truck over on the side of the road specifically to spank A.T. with a belt. Woody admitted hitting A.T. harder than he should have on past occasions; at minimum, this evidences that his disciplinary role was ongoing, not isolated.

17

Trial testimony indicates Woody and Skorich both provided information about A.T.'s medical history to providers. Video evidence shows that when Woody was interviewed at the hospital, he told the police officer that he and Skorich knew of A.T.'s declining medical condition, and *he* made the decision they would wait and see if it improved over the next few days. One could not make such a decision absent care, custody, or control.

Based on the cumulative force of the direct and circumstantial evidence, the reasonable inferences from the evidence, and deferring to the jury on matters of credibility and weight, we hold there is sufficient evidence to support the element of care, custody, or control.

We overrule Woody's sufficiency issue.

2. Skorich's challenge: no evidence

Skorich alleges the evidence was insufficient to show she failed to provide nourishment or medical care and insufficient to show she failed to provide protection from assault. As with Woody's sufficiency contention, we disagree.

A person acts knowingly or with knowledge with respect to a result of her conduct when she "is aware that [her] conduct is reasonably certain to cause the result." TEX. PENAL CODE § 6.03(b). A person acts recklessly with respect to the result of her conduct when she is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. § 6.03(c). The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person

would exercise under all the circumstances as viewed from the actor's standpoint. *Id.* The jury charge instructed the jury on these definitions.

When a defendant is accused of injury to a child by omission, the state must prove either the defendant intended the harm through their inaction or knew their inaction was reasonably certain to cause injury. *Proo*, 587 S.W.3d at 809–10 (citations omitted). Mental state almost always depends on circumstantial evidence rather than direct proof. *Id.* at 810 (citing *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *Smith v. State*, 56 S.W.3d 739, 745 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd)). The defendant's mental state may be inferred from any facts, including the defendant's acts, words, and conduct, the method of committing the crime, and the nature of wounds inflicted. *Proo,* 587 S.W.3d at 810 (citing *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002)).

The evidence established A.T. had obvious dehydration and physical injuries the jury could reasonably infer Skorich would have noticed. Skorich testified she knew that lack of water and food would cause death. Skorich stated A.T.'s lips were dry, his gums bled, he was lethargic, and he pleaded for water. She observed his deterioration from lethargy, to unconsciousness, to unresponsiveness.[12] Woody's statements to the police confirmed that the couple was so concerned about A.T.'s health that they discussed when he should be taken to the hospital.

---

[12] Skorich testified that she called A.T.'s primary care physician because she was concerned about him. According to Skorich, the doctor's office advised her to "keep doing what she was doing" and to take A.T. to the hospital if he worsened. She argues this evidence negates the jury's finding. But no evidence corroborates the substance of the call beyond Skorich's own testimony, and the jury was free to disbelieve her. *See Torres*, 141 S.W.3d at 654.

19

Dr. Mattamal testified that before A.T. became unresponsive, he would have exhibited observable symptoms, such as less activity, glazed eyes, and not talking. Woody acknowledged that A.T. had been feverish and weak for three days leading up to the hospitalization. A.T. was asleep for most of the day, and Skorich would have to physically try to wake him up and ask if he was hungry or thirsty. She said A.T. would nod his head yes, but his eyes would remain closed. She would try to force the food or the water by giving him sips or rubbing it on his gums.

When A.T. was admitted to the emergency room, he was severely dehydrated, with record-breaking high levels of sodium. Because A.T. was so dehydrated, staff could not reliably find a vein for an IV and had to use an intraosseous device to pump fluids directly into the boy's bone marrow. His kidney failure caused toxic levels of urea in his blood. The treating physicians stated A.T.'s dehydration had occurred over time and was inconsistent with having a virus. It showed A.T.'s level of dehydration was not something a person could achieve on their own.

The jury could have disregarded Skorich's statements that she was giving A.T. food and fluids. Her portrayal of unremarkable symptoms is difficult to square with Woody's admission to the officer that they had discussed taking A.T. to the hospital due to his progressively worsening condition.

The evidence also supports a finding that Skorich failed to protect A.T. from assault. A.T. had multiple physical injuries in various stages of healing all over his body that were visually obvious and immediately apparent to the emergency room staff when he was brought in. They were also obvious to Woody, yet Skorich denied knowledge of

20

any. According to the health care providers, different phases of healing showed the injuries occurred over an extended period of time and during multiple incidents. The jury had the opportunity to hear Appellants' varying and conflicting explanations for how A.T. could have received such injuries and to compare them to the medical evidence offered at trial.

The evidence showing the extent of A.T.'s injuries was not limited to testimony; the jury was allowed to see photographs of the boy at the time of his hospital admission. Such visual images may refute a defendant's claim of lack of knowledge or recklessness by clarifying and supporting the observations and conclusions about a victim's condition. *Proo*, 587 S.W.3d at 809–13. They often give the factfinder a point of comparison against which to test the credibility of a witness and the validity of her conclusions. *See Sifuentes v. State*, No. 04-12-00607-CR, 2013 Tex. App. LEXIS 8105, at *16 (Tex. App.—San Antonio July 3, 2013, no pet.) (mem. op.).

In sum, the jury was free to disregard Skorich's denials of knowledge about A.T.'s physical injuries. Based on the medical testimony, the parties' contemporaneous statements to law enforcement, and the visual evidence, the jury could have reasonably inferred Skorich knowingly or recklessly caused A.T.'s serious bodily injury and bodily injury by failing to provide him with protection from assault, adequate nutrition, and medical care.

We overrule Skorich's sufficiency issue.

21

## CONCLUSION

Having overruled all of Appellants' issues, we affirm the trial court's judgments.


Lawrence M. Doss
Justice


Publish.